Guillermo MOJICA, Plaintiff,

v.

Janet RENO, as Attorney General of the United States; Doris Meissner, as Commissioner of the Immigration and Naturalization Service; Edward McElroy, as New York District Director of the Immigration and Naturalization Service; John B.Z. Caplinger, as New Orleans District Director of the Immigration and Naturalization Service; Immigration and Naturalization Service, Respondents.

Saul NAVAS, Plaintiff,

v.

Janet RENO, as Attorney General of the United States; Doris Meissner, as Commissioner of the Immigration and Naturalization Service; Edward McElroy, as New York District Director of the Immigration and Naturalization Service; Immigration and Naturalization Service, Respondents.

Nos. CV 97–1085(JBW),
CV 97–1869(JBW).

United States District Court,
E.D. New York.

July 11, 1997.

134

Zachary W. Carter, United States Attorney, Eastern District of New York, Brooklyn, NY by Scott Dunn, Mary Elizabeth Delli-Pizzi, for Respondent–Defendants.

Bretz & Associates, Irwin Berowitz, Alan Strauss, New York City, for Petitioner Mojica.

AMENDED MEMORANDUM
AND JUDGMENTS

WEINSTEIN, Senior District Judge.

I. Introduction ................................................... 136

II. Facts ......................................................... 136
 A. Discretionary Relief from Deportation and the Recent Amendments ........ 136
 B. Saul Navas ................................................. 138
 C. Guillermo Mojica ........................................... 140

III. Constitutional, Statutory and Historical Context ................................ 142
 A. History of Immigration ...................................... 143
 B. Human Rights Obligations of the United States ........................... 146
 C. Habeas Corpus ............................................. 152
 D. Presumption Against Retroactivity ................................. 154
 E. Judicial Review of Administrative Actions .............................. 155

IV. Jurisdiction .................................................. 156
 A. Subject Matter Jurisdiction ...................................... 156
 (1) Statutory Background ..................................... 157
 (a) Section 2241 of Title 28 ............................... 157
 (b) INA Section 106(a), The AEDPA, and The IIRIRA ................ 158
 (2) Habeas Corpus Jurisdiction Under Section 2241 Not Repealed ........... 159
 (3) Scope of Section 2241 Habeas Review ........................... 163
 (4) Section 2241 Habeas Corpus Jurisdiction Available in Instant
 Case ................................................. 163
 (a) A District Court May Review a Section 2241 Petition ............. 163
 (b) Petitioners in Custody For Habeas Purposes ................... 164
 B. Eastern District of New York Is the Proper Forum: Personal Juris-
 diction and Venue ........................................... 165
 (1) Court Has Personal Jurisdiction Over Petitioners' Custodians ........... 165
 (2) Venue Is Proper with Regard to Petitioners ...................... 167

V. Protection of Legal Permanent Residents Against Arbitrary Deportation ......... 168
 A. Statutory History of Section 212(c) and Section 440(d) ..................... 168
 B. Section 440(d) Does Not Retroactively Eliminate Right of Petitioners
 to a Fairness Hearing ........................................ 168
 (1) Constitutional Barriers to Retroactivity .......................... 169
 (2) Manifest Congressional Design ................................ 172
 (3) Applying the Default Rule Against Retroactivity .................... 173
 (a) Basic Application of Landgraf ............................ 173
 (b) Traditional Principles of Statutory Interpretation ............... 180
 (c) No Deference to the Administrative Agency ..................... 180
 (d) A Fortiori Application to Those Whose Cases Were Being
 Processed by the INS .................................. 182

VI. Conclusion ................................................... 182

## I. Introduction

This is an important case of first impression, the resolution of which will affect the rights of many legal permanent residents. Petitioners, long time United States residents, seek a court ruling that they are entitled to a hearing determining whether they should not be deported because of humanitarian factors—commonly known as section 212(c) relief. At issue is the new policy and practice of the United States Attorney General to automatically deport certain legal permanent residents. Her action is predicated on her conclusion that there must be retroactive application of section 440(d) of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L.No. 104–132, 110 Stat. 1214 (1996). Section 440(d) bars legal permanent residents convicted of certain crimes from seeking a 212(c) waiver of deportation.

The Attorney General, it is charged, without notice and without reason, arbitrarily and capriciously reversed the ruling of the Board of Immigration Appeals that petitioners had a right to a 212(c) hearing. The government contends: 1) this court has no jurisdiction to consider this issue, and 2) even though the petitioners were convicted of crimes before passage of the AEDPA, they have no entitlement to a waiver hearing—that is to say, rehabilitation, hardship, deleterious effects on family and other 212(c) factors are now retroactively irrelevant.

It is not necessary to consider petitioners' constitutional arguments because the case can be decided as a matter of statutory interpretation. Nevertheless, in construing the statutes' meaning, history, statutory and other protections, and constitutional context provide useful background. The courts have the obligation to consider the context of legislation to determine meaning; this duty is independent of any theory of textualism in interpretation. *See, e.g.,* John F. Manning, Textualism as a Nondelegation Doctrine, 97 Colum.L.Rev. 673 (1997).

To prevent the extended bureaucracy and the executive departments from abusing their powers, Congress has fashioned an extensive set of protections for all individuals resident in our land, providing appeals and other controls by the Judiciary. Moreover, Congress can be presumed to have acted in the high moral and ethical traditions of the United States after consideration of relevant historical and political factors and with consciousness of the United States' role as global defender of human rights. The courts cannot assume, as the government now in effect suggests they should, that Congress acted contrary to the design and thrust of closely related law.

For reasons set forth below, this court has habeas corpus and declaratory judgment competence, and personal jurisdiction over petitioners' custodians. Venue is proper, and petitioners are entitled to the hearing they seek. This conclusion was set forth in the memorandum and order of this court entered May 30, 1997. *See Mojica v. Reno,* 1997 WL 289700 (E.D.N.Y.1997). That memorandum and order was issued without an explanatory memorandum to expedite appeals.

## II. Facts

### A. Discretionary Relief from Deportation and the Recent Amendments

It is conceded that petitioners Saul Navas and Guillermo Mojica would have been, until quite recently, eligible for a 212(c) hearing. The government argues that, in the wake of the AEDPA, they are no longer eligible. Section 212(c) relief, its history, and recent amendments to it are addressed immediately below.

Legal permanent residents convicted of a crime making them deportable have long had a right to seek a waiver of exclusion or deportation under section 212(c) of the Immigration and Nationality Act (INA) as long as they had a "lawful unrelinquished domicile of seven consecutive years in the United States." *See* INA § 212(c), 8 U.S.C. § 1182(c) (added by Immigration and Nationality Act of 1952); *see also Francis v. INS,* 532 F.2d 268 (2d Cir.1976) (holding that section 212(c) relief is available in deportation as well as exclusion proceedings); *Matter of Silva,* 16 Int. Dec. 26 (BIA 1976) (adopting and applying *Francis* holding nationwide). It is conceded that petitioners have had more

than the necessary domicile in the United States to have triggered section 212(c) rights to a hearing. It is important to bear in mind that the right is to a hearing only and to the exercise of discretion, not to immunity from deportation.

A long-time legal permanent resident accused of any crime triggering deportability could thus be assured that, even if he or she pled guilty or was convicted in criminal proceedings after the trial, there would be available a waiver of deportation in subsequent deportation proceedings before an Immigration Judge. *See generally Matter of Lok*, 18 Int. Dec. 101 (BIA 1981), *aff'd on other grounds, Lok v. INS*, 681 F.2d 107 (2d Cir. 1982) (if the individual could expect to have the seven years by the time of deportation proceedings he or she could be assured of being able to seek the waiver). The Immigration Judge's decision to grant the waiver depends upon a weighing of many factors. Among the favorable elements considered by an Immigration Judge under section 212(c) are family ties within the United States, residence of long duration in this country (particularly when the inception of residence occurred at a young age), evidence of hardship to the individual and family if deportation were to occur, service in this country's armed forces, a history of employment, existence of property or business ties, evidence of value and service to the community, proof of rehabilitation, and other evidence attesting to an individual's good character and likelihood of future positive contributions to American society. *See generally Matter of Marin*, 16 Int. Dec. 581 (BIA 1978).

Until April 24, 1996, a section 212(c) waiver was precluded only for a legal permanent resident whose crimes fell within the INA definition of an "aggravated felony" and who had served five years or more in prison for the crimes. *See* Immigration Act of 1990 (IMMACT), Pub.L. No. 101–649, Section 511(a), 104 Stat. 4978, 5052 (1990), as amended by the Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Section 306(a)(10), Pub.L. No. 102–232, 105 Stat. 1733, 1751 (1991) (imposing limitation on § 212(c) relief).

On April 24, 1996, Congress enacted the AEDPA, Pub.L. No. 104–132, 110 Stat. 1214 (1996), which included a provision—section 440(d)—barring section 212(c) relief for individuals "deportable by reason of having committed any criminal offense" coming within several broad classes of crimes, including many relatively minor offenses, regardless of the sentence imposed by the criminal judge, or whether any sentence of imprisonment at all was imposed. Specifically, section 440(d) amended section 212(c) to provide that the waiver is not applicable to an individual who is deportable by reason of having committed (1) an aggravated felony, regardless of the sentence imposed or served, (2) a controlled substance violation, (3) a firearm offense, (4) one of various miscellaneous crimes, or (5) two or more crimes said to involve "moral turpitude"—a category of offenses that includes certain crimes that fail to live up to this hyperbolic appellation. Under this provision, for example, a legal permanent resident convicted of one minor drug possession charge, or two misdemeanor petty theft or public transportation fare evasion charges—turnstile jumping in the New York City subway system leading to a "theft of services" misdemeanor conviction is considered a crime of "moral turpitude" —is now subject to automatic deportation without any opportunity to present to an Immigration Judge any mitigating equities.

Under the Attorney General's view, any such person could now be picked up off the streets for crimes of this nature committed many years ago, torn from his or her family, job or business, and deported without the fight to seek a waiver with an Immigration Judge on section 212(c) grounds. Immediately after the AEDPA's enactment, the Immigration and Naturalization Service (INS) began arguing that section 440(d) applied in all pending and subsequently initiated deportation cases, regardless of whether the conduct or events triggering the section's restrictions pre-dated the AEDPA.

This position was rejected by the Board of Immigration Appeals (BIA) in a June 27, 1996 decision. The BIA held that section 440(d) may not be applied retroactively to an individual who sought 212(c) relief prior to

the AEDPA's enactment on April 24, 1996. *Matter of Soriano*, Int. Dec. 3289, 1996 WL 426888 (BIA June 27, 1996).

The INS sought review of the BIA's *Soriano* decision by the Attorney General. On September 12, 1996, the Attorney General vacated the BIA's decision without providing for public notice or hearing contrary arguments. Some months later, she issued a brief written decision, unsupported by relevant authority, concluding that section 440(d) should be applied to all pending 212(c) waiver cases, even in cases where it was triggered by events pre-dating the AEDPA's enactment. The Attorney General found that "nothing in the language of the newly enacted statute, AEDPA § 440(d), specifies either that it is to be applied in pending deportation proceedings, or that it is not to be." *Matter of Soriano*, Int. Dec. 3289, 1996 WL 426888, at screen page 41 (beginning at screen page 37, AG Op. Feb. 21, 1997). The Attorney General *ipse dixit* decided in favor of retroactivity even in pending cases.

Although of no direct relevance in the instant case, Congress has enacted further statutory reforms related to section 212(c). Specifically, section 212(c) was repealed, effective April 1, 1997, by the "Illegal Immigration Reform and Immigrant Responsibility Act of 1996" (IIRIRA), Section 304(b), Pub.L. No. 104–208, Division C, 110 Stat. 3009 (1996). The IIRIRA replaced section 212(c) relief with a new form of prospective relief for lawful permanent residents called Cancellation of Removal. *See* IIRIRA § 304(a)(3) (new INA § 240A(a)). In general, the repeal and new cancellation relief in the IIRIRA does not apply in proceedings initiated prior to April 1, 1997—as were petitioners' proceedings. *See* IIRIRA § 309(c)(1) (providing that general rule is that the IIRIRA does not apply to deportation proceedings commenced before April 1, 1997); IIRIRA § 309(c)(2) and (3) (providing the Attorney General with the option to apply IIRIRA law in certain deportation cases pending on April 1, 1997); new 8 C.F.R. § 240.40, published at 62 Fed.Reg. 10371 (March 6, 1997) (following general rule only); and new 8 C.F.R. § 240.16, published at 62 Fed.Reg. 10374 (March 6, 1997) (indicating that at some undetermined time in the future, the Attorney General may pursue options to apply IIRIRA law in certain cases).

The government now argues that section 440(d) applies to all legal permanent residents in deportation proceedings on or after the date of enactment ·of the AEDPA, regardless of when they committed or were convicted of an offense covered by that section. Under the government's reading, legal permanent residents, many with relatively minor convictions, would now be subject to automatic deportation even if the conduct and conviction took place years or decades ago and even if section 212(c) proceedings were pending when the AEDPA was adopted.

## B. Saul Navas

Petitioner Navas is a twenty-two year old native and citizen of Panama who lives in St. Albans, New York, within the Eastern District of New York. He was admitted to the United States as a legal permanent resident on July 10, 1987 when he was twelve years old. Since the time of his admission into the United States over nine years ago, he has continuously resided here. Navas's entire immediate family, which includes his mother and step-father, one brother, two half siblings and five step-siblings, resides in the United States. All members of his family are either United States citizens or legal permanent residents. In Panama, Navas has no immediate family and no means of support.

Navas attended Junior High School and High School up to the twelfth grade in Queens, New York. Thereafter he worked in New York City as a delivery boy, as a stock boy, as a building maintenance worker, and as a waiter.

On May 2, 1995, Navas was sentenced in the New York Supreme Court, Queens County as a result of two guilty pleas to offenses committed in Queens. In the first case which involved driving a stolen automobile, Navas was convicted of criminal possession of stolen property in the third degree. In the second case, a purse snatching incident, Navas was convicted of robbery in the third degree. He received concurrent sentences of

one and a half years to four and a half years incarceration. Because he was a fit candidate for rehabilitation, Navas was accepted into the "Shock Incarceration Program" at Lakeview Correctional Facility to serve his sentence. He successfully completed the program on January 8, 1996, and, as a result, was required to serve only eight months.

While Navas was in the Shock program, the INS commenced deportation proceedings against him. In its order to show cause, dated July 21, 1995, the INS alleged that Navas was deportable under section 241(a)(2)(A)(ii) of the Immigration and Nationality Act (INA), which at that time provided that an alien was deportable by reason of having committed two crimes of moral turpitude that did not arise out of a single scheme of criminal conduct.

Navas first appeared before an Immigration Judge on October 11, 1995. At that time he was given an adjournment until November 8, 1995 to retain an attorney. On November 8, 1995, Navas, acting *pro se* and still incarcerated, admitted the allegations listed in the order to show cause and was found deportable by the Immigration Judge. The Immigration Judge advised Navas of the availability of a waiver of deportation pursuant to section 212(c) and encouraged him to apply for such waiver.

On December 8, 1995, Navas filed his application for a 212(c) waiver of deportation with the Office of the Immigration Judge in Napanoch, New York. On or about January 8, 1996, due to his successful completion of the Shock Incarceration Program, Navas was released from state custody. He was, however, immediately taken into custody by the INS and detained at Wyoming County Jail, in Warsaw, New York. The INS set a $9,000 bond for Navas's release. Navas's request that venue be changed to New York City was granted and the INS transferred Navas to its detention facility located at 201 Varick Street, New York, New York where Navas remained in the custody of the INS until May 10, 1996.

On April 24, 1996, the President signed the AEDPA into law. Navas's individual hearing for 212(c) relief was held on May 9, 1996. At his hearing, evidence was admitted and testimony taken from Navas and other witnesses. After all the evidence was presented, the Immigration Judge determined that Navas was eligible for a section 212(c) waiver and granted him a waiver on the merits of the case. Among the positive factors considered by the Immigration Judge were Navas's residency in the United States since a very young age, his substantial family ties to the United States, and his history of employment. The deportation proceedings against Navas were terminated. At that time, the INS reserved its right to appeal the IJ's decision.

On May 10, 1996, the day after Navas's individual hearing, INS released him from detention at Varick Street, without his having to post a bond. By notice of appeal dated May 14, 1996, the INS appealed the Immigration Judge's decision solely on the merits of the case. The INS did not challenge Navas's statutory eligibility to apply for a 212(c) waiver. While the INS timely filed its notice of appeal, the INS did not perfect its appeal as required by the BIA's briefing schedule. The notice provided that the INS submit its brief by June 27, 1996 and that Navas submit his brief on or before August 28, 1996.

On June 27, 1996, as already explained, the Board of Immigration Appeals held that section 440(d) may not be applied retroactively to persons such as Mr. Navas who applied for a waiver of deportation prior to April 24, 1996. The INS sought review of the BIA decision by the Attorney General.

By motion dated August 21, 1996, more than three weeks after the INS's time to submit its brief to the BIA had expired, the INS requested an extension of time to submit its brief. Navas filed a motion to dismiss the INS's appeal on the ground that 1) the INS had not submitted a timely brief in support of its appeal and 2) in support on the merits of the Immigration Judge's decision granting Navas a waiver.

On September 12, 1996, the Attorney General vacated the BIA decision in *Soriano*, 1996 WL 426888 (BIA June 27 1996). On September 30, 1996, the President signed into law the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996, Pub.L. 104–207, 110 Stat. 3009 (IIRIRA). Among other things, the IIRIRA amended AEDPA section 440(d) to remove the requirement that in order to trigger the bar to section 212(c) relief, the two crimes of moral turpitude had to have been committed within five years of entry, effective as if included in the AEDPA. *See* IIRIRA § 237(a)(2)(A)(ii).

On February 21, 1997, the Attorney General issued her decision in *Matter of Soriano,* Int. Dec. 3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21 1997), holding that the amendments to INA section 212(c) made by AEDPA section 440(d) apply to all deportation proceedings in which an application for relief under section 212(c) was pending when the AEDPA was signed into law. Thereafter, the BIA began systematically ordering deported all immigrants with pending applications for a waiver of deportation that were affected by section 440(d).

Relying upon the Attorney General's retroactivity decision, the BIA, on March 14, 1997, sustained the INS's appeal in Navas's case and ordered him deported to Panama. It did not address Navas's motion to dismiss the INS's appeal nor the merits of the appeal and never ruled on the INS's motion to file a late memorandum of law in support of its appeal. As of the date of the BIA's decision and order Navas has been subject to a final order of deportation.

On April 11, 1997, Navas filed a Petition for Review with the United States Court of Appeals for the Second Circuit to protect his appeal rights in case that court determines that it may exercise jurisdiction to entertain the issues raised in the petition. But see *Hincapie–Nieto v. Immigration and Naturalization Service,* 92 F.3d 27 (2d Cir.1996) (finding no court of appeals jurisdiction). On April 15, 1997, Navas filed the instant petition for Habeas Corpus with this court.

By notice dated May 8, 1997, the INS ordered Navas, then resident and at large in Queens, within the Eastern District of New York, to surrender on May 27, 1997 at its Deportation Branch located at 26 Federal Plaza, New York, New York. The INS released him on $2,000 bond. The government has stipulated that it will not deport him until the present proceeding is terminated following appeals from the judgment of this court. If deported from the United States, Navas, it may be assumed, will not be able to return here to his family.

### C. Guillermo Mojica

Guillermo Mojica was born on April 15, 1941. He is a native and citizen of Colombia. He has been a legal permanent resident of the United States for twenty-five years, since June 8, 1972. He has lived in Queens, New York ever since he came to the United States.

Mojica married his present wife on November 28, 1980 at a ceremony in Queens. She became a naturalized United States citizen on May 15, 1990. They have two United States citizen children: a daughter, Alexandra, born in Queens on November 13, 1973, and a son, Jean Paul, born in Manhattan on May 29, 1979. The family lives in Elmhurst, Queens, New York.

By federal indictment filed in 1988 in this district, the government alleged that Mojica conspired with others to distribute cocaine in violation of, *inter alia,* section 846 of title 21. Mojica pled guilty to the charge of conspiracy to distribute cocaine. He had no prior convictions. He was sentenced to one year in prison. He began serving his sentence on March 21, 1989. He was released from prison on March 12, 1990. He was not subject to supervision after release.

Some four years after his release in the spring of 1994, Mojica renewed his Alien Registration Card. He encountered no problems with the renewal. The INS neither inquired into his conviction nor began deportation proceedings. A year later, in April of 1995, Mojica applied for United States citizenship, paying the $95.00 fee and filing the appropriate form at 26 Federal Plaza in Manhattan. As required by law, he noted on the application that he had been an illicit trafficker in narcotic drugs and that he had been arrested, cited, charged, indicted, convicted, and imprisoned for violation of the law. He also attached a letter requesting "clemency for [his] unlawful activity which occurred in 1988."

On January 9, 1996, when he and his wife were returning from a visit to see family in Ecuador, Mojica was detained at JFK airport. He was held until 7:00 the next morning, when he was paroled into the United States. Parole is a mechanism permitting the INS to allow an alien to remain free within the borders of the United States without "admitting" the alien into this country. It is based on a fiction whereby, although free to move about within the United States, the alien remains "at the threshold of admission." *See* 8 C.F.R. § 235.3(c). The INS inspector took Mojica's passport and Alien Registration Card (Green Card) and he was told to report to INS at 26 Federal Plaza on February 12, 1996, and to bring with him certified copies of his almost eight year-old criminal case disposition. The INS Airport Director at JFK later requested that a certified copy of Mojica's record of conviction be sent to the Supervisory Immigration Inspector so the Service could "sustain exclusion charges" and place Mojica in exclusion proceedings.

Contemporaneously, the INS sent Mojica a notice that his naturalization interview was to be conducted on March 12, 1996. The notice advised Mojica to bring his passport and Green Card. On February 12, 1996, Mojica went to the INS at 26 Federal Plaza as ordered with certified copies of his Eastern District criminal case disposition. The INS did not return Mojica's passport or Green Card. Instead, it told him that it would contact him. At this deferred inspection, Mojica was accompanied by his attorney, who filed a notice of appearance with the INS. Mojica did not go to his naturalization interview as scheduled on March 12. The INS, however, did not close his case; it noted in the file that the application would remain valid for one year. On April 10, 1996 Mojica's attorney wrote to the INS at 26 Federal Plaza asking it to return Mojica's Green Card. No reply was received.

On April 24, 1996, as already noted in connection with Navas, the President signed into law the AEDPA. (For clarity the statutory chronology is repeated as to Mojica.) As discussed above, section 440(d) of the AEDPA added a provision that INA Section 212(c) waivers of deportation are no longer available for persons "deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [or] (B) . . . . "

On May 28, 1996, Mojica's attorney sent a second letter to the INS at 26 Federal Plaza, New York, asking the INS to expedite the proceedings. The next day, Mojica, on his own initiative, went to the INS office at 26 Federal Plaza to ask for his passport. He arrived at 10:00 a.m. and asked for his papers. He was told to wait. Then, at approximately noon, the INS told him that his papers were being processed and that his documents would be returned to him that afternoon. Instead, however, of preparing to return Mojica's documents, an inspector in the Office of Deferred Inspections filled out another form, "Record of Deportable Alien." Then, at approximately 4:30 p.m. the INS admitted Mojica into the United States as a lawful permanent resident. *See Matter of V—Q—,* 9 Int. Dec. at 79–80 (BIA 1960) (citations omitted) (admission is defined as "the freeing of an alien from the legal restraints to which the immigration laws subject him. . . . 'Admission' occurs when an authorized employee of the Service communicates in a tangible manner to an applicant for admission his determination that the applicant has established that he is not inadmissible under the immigration laws. At the point such communication is made and received by the applicant, 'admission' has occurred").

The INS immediately served Mojica with a Warrant for the Arrest of Alien. The warrant alleged that Mojica, whom the Service had just admitted into the United States, was "within the United States in violation of the immigration laws." The INS also served Mojica with an order to show cause, charging him with deportability pursuant to INA sections 241(a)(2)(A)(iii) and 241(a)(2)(B)(i). Thus, at the same time that the INS determined that Mojica was not inadmissible for his drug trafficking conviction, and therefore not subject to exclusion proceedings, it charged him with deportability for the same conviction. The order to show cause, which was to be filed with an Immigration Judge at

201 Varick Street, ordered Mojica to appear for a hearing before an Immigration Judge at that same location. Here he was served with notice that he was being detained without bond. He was then transported to the Varick Street INS lockup, where he was accepted into custody.

Although the INS had notices of appearance from Mojica's attorney and was thus aware that he was represented by counsel, Mojica was not taken before an Immigration Judge while at Varick Street. Instead, on June 5, 1996, the INS transferred him from Varick Street to the INS detention facility at Oakdale, Louisiana.

On June 27, 1996, as pointed out above, the Board of Immigration Appeals decided *Matter of Soriano*, Int. Dec. 3289, 1996 WL 426888 (BIA June 27, 1996), holding that the AEDPA's bar to 212(c) relief for aliens "deportable by reason of having committed any criminal offense covered in section 241(a)(2)(A)(iii) [or] (B)" should not apply to aliens who had 212(c) applications pending on or before April 24, 1996.

On July 5, 1996, more than five weeks after he was taken into custody, Mojica saw an Immigration Judge in Louisiana for the first time. At the hearing, his attorney appeared telephonically from Brooklyn, and requested a change of venue to New York. Venue was not changed. The case was adjourned until August 2, 1996, when Mojica conceded deportability and was found deportable. He applied for relief from deportation pursuant to INA section 212(c).

The Immigration Judge found that he was ineligible for section 212(c) relief because the passage of the AEDPA on April 24, 1996 amended section 212(c) to provide that it is no longer available to aliens who are in deportation proceedings if they have been convicted of certain crimes, including drug trafficking crimes. Because Mojica was in deportation proceedings, and he had been convicted of a drug trafficking crime, the Immigration Judge reasoned that Mojica was ineligible for section 212(c) relief. He ordered Mojica deported from the United States.

Mojica mailed a notice of appeal. It was received in a timely fashion, on August 20, 1996, by the Board.

On September 12, 1996, as already noted, the Attorney General vacated the June 27, 1996 decision of the BIA in *Matter of Soriano*, Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning at screen page 37, AG Op. Feb. 21, 1997).

On October 21, 1996, a bond redetermination hearing was held for Mojica. Mojica's counsel appeared telephonically from New York City. He was granted release on a bond of $12,000.00, which was posted the next day by his daughter, Alexandra. The INS notified the Executive Office for Immigration Review that Mojica would be returning to his home.

On February 3, 1997, the BIA dismissed Mojica's appeal. Eleven days later, the INS issued a Notice to Deliver the Alien.

On February 21, 1997, the Attorney General issued her opinion in *Soriano* supporting her September 12, 1996 vacateur of the BIA's June 27, 1996 decision. *Matter of Soriano*, Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning at screen page 37, AG Op. Feb.. 21, 1997). The ruling provided that the AEDPA section 440(d) amendment to INA section 212(c) should be applied retroactively to all deportation proceedings pending on April 24, 1996.

On March 4, 1997, Mojica filed a petition for a writ of habeas corpus in this court. The next day, the court ordered Mojica to surrender to the INS in Oakdale, Louisiana. Mojica flew from LaGuardia Airport to Oakdale, and was accepted by the INS on May 7, 1997. As in the case of Navas, the government has agreed not to deport Mojica pending termination of the instant proceeding and appeals.

III. **Constitutional, Statutory and Historical Context**

While federal judicial supremacy in interpretation of the United States Constitution has been acknowledged since the time of Justice John Marshall, all public officials

have an independent obligation to follow the Constitution on their own motion. Congress and the President—as well as the courts—are expected to adhere whole-heartedly to our commitments to the dignity of persons as embodied in that document and in our history, giving its language substance and meaning. *See, e.g.,* Larry Alexander and Frederick Schauer, On Extrajudicial Constitutional Interpretation, 110 Harv.L.Rev. 1359 (1997) (authorities cited).

In construing a statute courts approach their task with the assumption that Congress and the President acted with sensitivity to the fundamental thrust of our history as one of the world's foremost proponents of the rule of law and human rights, including fairness to all within our borders. It is therefore appropriate when deciding the meaning of the important new statutes dealing with legal permanent residents to put these provisions in their historical and constitutional setting. With this need in mind, as an aid to understanding the relevant provisions, the discussion that follows briefly touches upon the history of: (1) immigration in this country, (2) the international role of this county as a global leader in the defense of human rights (3) habeas corpus, (4) the ex post facto rule and its sibling, retroactivity, and (5) United States internal law designed to check arbitrary and capricious conduct by the bureaucracy.

### A. History of Immigration

Ours is a nation of immigrants and their descendants. Except for the Native Americans whose ancestors were believed to have walked over the Bering Straits land bridge from Asia some twenty-five millennia ago (*See Bradley v. Milliken,* 484 F.2d 215, 274 (6th Cir.1973) (dissenting opinion), all of us trace our genealogy to overseas forebears who arrived here within the past few hundred years. *Cf.* Tunku Varadarajan, Skeleton May Prove Indians were not the First Americans, Times (London), June 11, 1997, at 12. In our early history immigrants were welcomed to fill an enormous shortage of labor and to settle huge spaces almost devoid—by European standards—of people. Since the colonial period, those seeking reli-gious toleration, political freedom and economic opportunity have been freely received. This trend of unrivaled openness and acceptance continues. *See, generally,* Thomas A. Aleinikoff and David A. Martin, Immigration: Process and Policy 39–63 (1991) (detailed history of immigration to the United States); Gabriel Chin, The Civil Rights Revolution Comes to Immigration Law: A New Look at the Immigration and Nationality Act of 1965, 75 N.C.L.Rev. 273 (1996); see also, William Branigin, U.S. Posts 27% Rise in Legal Immigration; Almost 916,000 People Admitted Last Year, Wash. Post, Apr. 23, 1997, at A15.

This country has grown and prospered in a climate of constant refreshment by the introduction into our midst of adventurous spirits willing to leave the security and predictability of what they knew in their lands and rulers they adjured for the hope of full equality of rights and opportunities within our borders. This American attribute is also the result of more than a collective self-conception, uncontrived and spontaneous development of custom, or nostalgic harkening back to the lore of our national beginnings. *See, e.g.,* Peter H. Schuck, The Transformation of Immigration Law, 84 Colum. L.Rev. 1, 8 (1984) ("American society has always prided itself on the inclusive, assimilative conception of nationhood that it embraces and offers to those who would join us. These qualities of openness have been a dominant feature of our self-definition and national myths."). Our treatment of aliens is rooted deeply in the fertile soil of constitutional and statutory design.

Unlike some European nations which favor citizenship and repatriation by theories of "blood" and "race," full citizenship by birth and easy administrative methods of obtaining citizenship have almost always been favored in this country. *See* U.S. Const. Amend. 14, § I ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside"); Civil Rights Act of 1866, ch. 31, 14 Stat. 27 (confirming concept of *jus soli*—citizenship conferred automatically to African–Americans by birth in United States), currently codified at 8 U.S.C. § 1401 (defining persons who

acquire citizenship at birth); The Act of June 2, 1924, 43 Stat. 253 (conferring citizenship upon all indigenous peoples born within the United States), currently codified at 8 U.S.C. § 1401 (defining persons who acquire citizenship at birth); *see also, United States v. Wong Kim Ark*, 169 U.S. 649, 18 S.Ct. 456, 42 L.Ed. 890 (1898); Jeffery B. Morris and Richard B. Morris, Encyclopedia of American History 630–644 (7th ed.1996)(immigration since colonial times and ethnic evaluation); Peter H. Schuck, The Transformation of Immigration Law, 84 Colum. L.Rev. 1, 9 & n. 26 (1984) (noting 1740 British statute allowing various groups to obtain rights of British subjects in the colonies). If we are not a "melting pot," it is generally true that we have at least constitutionally offered full integration to all citizens and residents, providing open access to our social, political, technological and economic structures (with some notable historical exceptions including the enslavement of African–Americans and the near genocide of indigenous peoples). *Cf., e.g.,* Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.*

Yet, it also cannot be gainsaid that there have been major exceptions to our positive constitutional and statutory river of equal rights policy and our national ethos of openness. Enslavement of those of African origin, the destruction of many Native American nations and the internment of Japanese–Americans are among the most obvious aberrations. There exists a constant tension with a more restrictive impulse. Streams of nativism and xenophobia have percolated and bubbled-up, typically in reaction to waves of immigration responding to demands for labor, based on unfounded fears about the criminality or inferiority of new immigrants. For instance, even though free immigration ruled the day in general, anti-alien sentiment started before the Revolution with statements by some our major leaders against German and other non-British subjects. *See, e.g.,* Marion T. Bennett, American Immigration Policies, A History 3, 7, 297 & n. 3 (1963) (against unrestricted immigration at one time or another were John Adams, John Quincy Adams, Benjamin Franklin, Alexander Hamilton, Patrick Henry, John Jay, Thomas Jefferson, Rufus King, James Madison, Gouverneur Morris and George Washington); *but cf.* Gil Loescher and John A. Scanlan, Calculated Kindness xiii (1986) (George Washington favored free immigration).

The Alien and Sedition Acts of 1798—clearly political in tone and enacted under the aegis of the High Federalists to enhance their political control—serve as further examples of deviation from our basic policy of easy acquisition of citizenship and full rights of resident aliens. As summarized in Jean Edward Smith's biography of John Marshall, the great Chief Justice-to-be, then a member of Congress, strongly opposed barriers to citizenship:

> The [Federalist] party also capitalized on the situation [with France] to pass the infamous alien and sedition acts of 1798—an ill-considered attempt to stifle domestic criticism. These laws involved four measures passed by Congress in June and July. The first, the Naturalization Act of June 18, 1798, extended the period of residence required for naturalization from five years to fourteen. The Federalists believed that most immigrants voted Republican, and they sought to keep them off the voters rolls as long as possible. The Alien Act of June 25, 1798, authorized the president to expel any nonnaturalized person of foreign birth whom he judged "dangerous to the peace and safety of the United States." The Alien Enemies Act of July 6, 1798, authorized the president, in the event of war, to designate as alien enemies any citizen or subject of a hostile nation residing in the United States and to make regulations to their apprehension, restraint, or removal. . . .

> [John] Marshall watched these developments with growing concern. . . . In fact, Marshall was the only party leader to question the legislation and the only one to recognize that the acts gave the Republicans an issue with which to win back popular support. The High Federalists, in their eagerness to put the country on a war footing had over-reached.

Jean Edward Smith, John Marshall, Definer of a Nation, 239 (1996). Marshall continued to oppose the Acts, and they were allowed to lapse. *Id.* at 244; *see also, e.g.,* Gerald L.

Neuman, Strangers to the Constitution 52–71 (1996) (Alien and Sedition Act debates). This was not the last dispute about aliens.

It is well known that prejudice against the Irish, the Chinese, the Japanese, the Italians, the Jews, the Mexicans and others emerged as these groups emigrated in substantial numbers; it persisted long after their arrival. *See, e.g.,* John Higham, Strangers in the Land, Patterns of American Nativism *passim* (1955) (also noting, *e.g.,* nativist opposition to Scandinavians and Catholics); Albert Eiseman, From Many Lands, *passim* (Athenium, 1970); Lucy E. Salyer, Laws Harsh as Tigers, Chinese Immigrants and the Shaping of Modern Immigration Laws (1995); J.R. Garcia, Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954 (1980).

For the most part, however, these attitudes were—and continue to be—relatively small eddies in the broader river of tolerance, and our need for the foreign born as labor. *See* Higham, Strangers in the Land, Patterns of American Nativism at 115 (business and industry "defense of immigration because of the need for unskilled labor"); *see also, e.g.,* Marion T. Bennett, American Immigration Policies, A History, 13, 53 (1963) ("Americans tended to welcome the foreigners;" the Know–Nothing Party of the mid-19th century failed to reduce the immigration tide since political needs of the two major parties, technological improvements in transportation, cheap land grants, and industrialists building a huge manufacturing capacity in steel and other products encouraged immigration); Select Commission on Immigration and Refugee Policy Staff Report, U.S. Immigration Policy and the National Interest (1981), *reprinted in* Thomas A. Aleinikoff and David A. Martin, Immigration: Process and Policy 45 (1991) ("After the Civil War, the country's desire for immigrants seemed insatiable"); *see also,* Blaine Harden and Jay Matthews, New Mix Enlivens N.Y. Melting Pot; Immigrants Are Vital Tonic After Decades of Population Drain, Wash. Post, May 26, 1997, at A1 (New York "is thriving, in large measure, because hundreds of thousands of [immigrants] are re-enacting grandpa's elbow-grease story ... immigrants are a windfall ... New York demographers credit immigrants with heading off a potentially 'catastrophic' population drain."); *cf.* John Cassidy, The Melting–Pot Myth, The New Yorker, July 14, 1997, at 40–43 (economic costs and benefits of current immigration).

Perhaps the country's most marked xenophobic paroxysm occurred in the 1920's with the closing of the immigration door and the favoring of West Europeans over Italians, Jews, Asians and others through numerical restrictions by country. *See, e.g.,* Marion T. Bennett, American Immigration Policies, A History, 40–70 (1963). The 1924 Exclusionary Act had a particularly disastrous effect in the 1930's and early 1940's when many thousands of Hitler's victims were excluded by the 1924 law, anti-Semitism, and prejudice of State Department officials. *See, e.g.,* Alberta Eiseman, From Many Lands 190–91 (1970) (Japanese); Gil Loescher and John A. Scanlan, Calculated Kindness, Refugees and America's Half–Open Door xiv (1986) ("In 1939 ... President Roosevelt implicitly acknowledging the strength of popular anti-Semitism, provided no support for a bill introduced by Congress which would have provided special immigration opportunities for up to 20,000 refugee children.").

World War II marked the end of that regrettable interlude, ushering in a return to an epoch of tolerance, equality and openness. Since 1945 "the United States has revived its traditional rhetoric of welcome—and matched its words with action." Gil Loescher and John Scanlan, Calculated Kindness, Refugees and America's Half Open Door xiv (1986). It was clear that after the revealed horrors of the effects of prejudice in Europe and elsewhere—a major factor in leading to the deaths of tens of millions in World War II—"restrictionism was out of place for a nation which aspired to moral and political leadership in the world." *Id.* at 143. "Since the end of World War II American immigration policies have become noticeably less racist and more humane." *Id.* at 21. This was only partly due to the politics of our anti-communist struggle. *Id.* at 219.

In the 1960s the United States afforded itself the moral satisfaction of passing a non-discriminatory immigration act, "avoiding"

the "crabbed and xenophobic one of 1924." Nathan Glazer, A Clamor at the Gates, The New American Immigration 7 (1985). The issue was no longer "whom we shall welcome," but how many, and how they could be treated with dignity, due process and equality as legal residents once they arrived. *Id.* at 11; *see also, e.g., Application of Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973) (invalidating exclusion of legal permanent residents of Connecticut from practicing law on Equal Protection grounds); *Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973) (striking down, on Equal Protection grounds, New York law that only United States citizens could hold permanent state civil service status); *but cf.* Peter D. Salins, Assimilation, American Style x (1997) (recent recurrence of a cycle of nativism "after a full half century of remission").

Signing the Immigration and Nationality Act of 1965, which eliminated the national origins system, President Lyndon B. Johnson spoke to the underlying values of the Act. At the foot of the Statue of Liberty in New York Harbor, the new law, he declared,

> repairs a deep and painful flaw in the fabric of American justice, it corrects a cruel and enduring wrong in the conduct of the American nation. It will make us truer to ourselves as a country and as a people.

Alberta Eiseman, From Many Lands, 201–02 (1970). This retreat from the attitude that aliens had no rights to embrace a regime grounded on notions that immigrants deserved to be treated "fairly" is well summarized by Professor Peter H. Schuck in his "Immigration Law and the Problem of Community":

> [A]profound ideological transformation has begun to undermine the individualistic foundations of classical immigration law, especially its core notion that the government owes no legal obligation to aliens apart from those flowing from the terms and conditions upon which it consented to their entry. By conceiving of entry as only a *privilege,* conditioned on an alien's acceptance of the limited claims and inferior status offered by the government, tradi-

tional courts hoped to reconcile restrictive nationalism with individualistic values. This "right-privilege" distinction, so familiar to the constitutional lawyers of an earlier day, was a seductive principle through which courts thought to vindicate the dominant ideals of consent, sovereignty and national community.

During the 1960s and 1970s, however, the American legal system outside the immigration field experienced a tidal wave of change, one that is now beginning to wash over immigration law, traditionally a most insular specialty.

Peter H. Schuck, Immigration Law and the Problem of Community, in Nathan Glazer, Clamor At the Gates, The New American Immigration, 297 (1985). *See also, e.g.,* Peter H. Schuck The Transformation of Immigration Law, 84 Colum.L Rev. 1 (1984); Note, Preserving Procedural Due Process for Legal Immigrants, 65 Fordham L.Rev.2065 (1997). In addition to internal United States constitutional doctrine strengthening the protection of resident aliens and an adherence to historic values alluded to by President Johnson at the 1965 Act's signing, powerful international forces were at work towards the same ends.

### B. Human Rights Obligations of the United States

In his magisterial Foreign Affairs and the U.S. Constitution, Professor Louis Henkin points out that an older view was that aliens need not be protected under the Constitution in the same way as citizens. *See generally,* Louis Henkin, Foreign Affairs and the U.S. Constitution 293–97 (2d ed.1997). Treatment of aliens was viewed as an aspect of foreign relations, intimately related to foreign policy interests. *Id.* at 295. Thus,

> When it became clear that equal protection was required by the federal government, rethinking (and justifying) long-established distinctions between citizens and aliens did not come readily and (at the end of the twentieth century) may not have come or been fully recognized yet.

*Id.* at 295. Where "the distinction between citizen and alien appears to have little significance for U.S. foreign relations," Professor

Henkin suggests, discrimination against aliens needs reconsideration. *Id.* at 296–97.

Congress and the President are presumed to know the persuasive and controlling effects on United States jurisprudence of the International Covenant in human rights and other like-manifestations of the law of nations which apply to aliens within United States borders. *See* Louis Henkin, Foreign Affairs and the U.S. Constitution 297 (2d ed.1997). The law of nations (and with it the developing law of human rights) has been treated as a part of the law of the United States since colonial times. *Id.* at 136, n. 17; *see also* Louis Henkin, "Evolving Concepts of International Human Rights and the Current Consensus" 170 F.R.D. 275, 275–81 (1997) (paper presented at the International Human Rights Session, Judicial Conference–Second Circuit, June 15, 1996). At the conference Professor Henkin declared: "How a nation treats its own inhabitants is now everybody's business potentially." *Id.* at 276.

There is no point in rehearsing the exact nature of each of the many relevant rights now applicable internationally. Given that this is a case of statutory construction, it is not necessary to declare in which way this country is constitutionally bound. *See* Henkin, Evolving Concepts, 170 F.R.D. at 284 (1997) (international human rights law as a guide to statutory interpretation); *Lareau v. Manson*, 507 F.Supp. 1177, 1189 n. 9 (D.Conn.1980) (Cabranes, J.) (same), *affirmed in part*, 651 F.2d 96 (2d Cir.1981); International Human Rights Instruments § 440.7 (Richard B. Lillich 2d ed.1990) (collecting articles and United States opinions relying on Universal Declaration of Human Rights). Congress—as the lawmaker of the leading proponent of international human rights law—is certainly aware of the elements of current international law that, absent an overriding national policy, it will follow.

Relevant as statutory guides are some of the provisions of the Universal Declaration of Human Rights:

*Article 9*

No one shall be subjected to arbitrary ... exile; ...

*Article 10*

Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations; ...

*Article 11(2)*

Nor shall a heavier penalty be imposed than the one that was applicable at the time the penal offense was committed....

Universal Declaration of Human Rights, *adopted* on Dec. 10, 1948 United Nations General Assembly Resolution 217A (III), *reprinted in* International Human Rights Instruments 440.1 (Richard B. Lillich 2d ed.1990).

These provisions and other like-documents may be construed to reflect the fight to stay of a lawfully present long-term resident alien. *Cf.* Patrick M. McFadden, The Right to Stay, 29 Vand. J. Transnat'l L. 1 (1996); Louis B. Sohn and Thomas Buergenthal, The Movement of Persons Across Borders 89 (1992) (in expelling aliens a "State must observe the requirements of due process of law, international and domestic").

Regional conventions also contain provisions protecting the fights of resident aliens against arbitrary expulsion and adding to the development of the growing consensus of human rights law as part of international law. *See e.g.,* 1969 American Convention on Human Rights, Act 22(6) and (8), *reprinted in* International Human Rights Instruments 190.1 (Richard B.R. Lillich 2d.1990); American Declaration of Human Rights, *reprinted in* International Human Rights Instruments § 430.1 (Richard B. Lillich 2d ed.1990); 1981 African Charter on Human and People's Rights, *reprinted in* International Human Rights Instruments 530.1 (Richard B. Lillich 2d ed.1990).

Article 3 of the 1995 European Convention on Human Rights and Fundamental Freedom recognizes that length of residence in the country increases the weight of an alien's right to stay. *See* International Human Rights Instruments §§ 500.1, 510.1 (Richard B. Lillich 2d ed.1990). It provides:

(1) Nationals of any Contracting Party lawfully residing in the territory of another Party may be expelled only if they endan-

ger national security or offend against *ordre public* or morality.

(2) Except where imperative considerations of national security otherwise require, a national of any Contracting Party who has been so lawfully residing for more than two years in the territory of any other Party shall not be expelled without first being allowed to submit reasons against his expulsion and to appeal to, and be represented for the purpose before, a competent authority or a person or persons specially designated by the competent authority.

(3) Nationals of any contracting Party who have been lawfully residing for more than ten years in the territory of any other Party may only be expelled for reasons of national security or if the other reasons mentioned in paragraph I of this article are of a particularly serious nature.

Article I of the 1984 Seventh Protocol to the European Convention for the Protection of Human Rights and Fundamental Freedoms provides:

(1) An alien lawfully resident in the territory of a State shall not be expelled therefrom except in pursuance of a decision reached in accordance with law and shall be allowed:

(a) to submit reasons against his expulsion,

(b) to have his case reviewed, and

(c) to be represented for these purposes before the competent authority or a person or persons designated by that authority.

(2) An alien may be expelled before the exercise of his rights under paragraph (1)(a), (b) and (c) of this Article, when such expulsion is necessary in the interests of public order or is grounded on reasons of national security.

*Id.*

In construing the Law of the European Convention on Human Rights, the European Court, the European Commission of Human Rights, and scholars have noted that in considering expulsion, two aspects must be considered: (1) the rights of the alien to be treated fairly, to a hearing, and to submit reasons against expulsion and, (2) the rights of the alien's family legally within the country not to suffer unduly because of expulsion. Relying on the Seventh Protocol—Freedom from Expulsion of Individual Aliens—and interpreting it, authors D.J. Harris, M. O'Boyle and C. Warbrick state, in reference to the first aspect:

This guarantees that an alien 'lawfully resident in the territory of a state shall not be expelled except in pursuance of a decision reached in accordance with law' and only, in most cases, after specified procedural rights have been respected. In contrast with Article 4 of the Fourth Protocol, it concerns cases of individual, rather than collective, expulsion. However, unlike Article 4, it requires only that the rule of law be complied with; it is not a prohibition on expulsion.

The requirement that the expulsion be 'in accordance with law' can likewise be taken to have the autonomous meaning that it has in other Convention provisions. Where Article 1 applies, the applicant must be allowed '(a) to submit reasons against his expulsion, (b) to have his case reviewed, and (c) to be represented for these purposes before the competent authority or a person or persons designated by that authority' (Article 1(1)). Exceptionally, an alien may be expelled before he has exercised these procedural rights where the expulsion is 'necessary in the interests of public order or is grounded on reasons of national security' (Article 1(2)). In both of these cases, ... the exceptions should be applied taking into account the principle of proportionality and the rights set out in Article 1(1) should be available after expulsion.

.... [T]he alien's right to submit reasons against his expulsion applies 'even before being able to have his case reviewed'. As to the right to have the expulsion decision 'reviewed', this 'does not necessarily require a two-stage procedure before different authorities'; it would be sufficient for the 'competent authority' that took the decision to consider the matter again. The 'competent authority' does not have to give the alien or his representative an oral

hearing; a written procedure would suffice. Nor does it have to have a power of decision; it is enough that it may make a recommendation to the body that does take the final decision. Clearly, the 'competent authority' does not itself have to be a judicial body that complies with Article 6, Convention. As a result, although Article I offers an alien at least the possibility of having his arguments against expulsion taken into account by the executive, . . . it offers only a modest guarantee of procedural due process.

D.J. Harris, M. O'Boyle and C. Warbrick, Law of the European Convention on Human Rights 565–66 (1995).

On the second and perhaps more telling point—the effect on family—Harris, O'Boyle and Warbrick, write:

One developing aspect of the positive obligation of a state to respect family life concerns the position of family members who do not have an independent right to enter or stay in a Convention state where other family members have a right to reside. The essence of family life is the right to live together. Initially, the Commission in *Agee v. UK* regarded the place where family life was to be enjoyed as the place where the father or husband had a right to reside. The Convention does not protect the right to live in a contracting state. Agee had no right to stay in the United Kingdom and it was not shown that his wife could not accompany him if he were deported from the United Kingdom. Accordingly, the United Kingdom would not fail to respect his right to family life if it expelled him from its territory. However, the Commission later accepted that there could be factors which bore on the possibility of effective family life if the other members of the family were compelled to follow the husband/father which undermined the absoluteness of its original criterion. More fundamentally, the discriminatory quality of the test—why should the place of ordinary residence of the family be where the father may go rather than where the mother may—also reduced the impact of the *Agee* rule.

It should be recognized that imposing the obligation on a state to admit a person to its territory or to allow him to stay when he has no right of residence there is a sensitive matter. The Court acknowledged this in *Abdulaziz, Cabalas and Balkandali v. UK* when it said:

'The duty imposed by Article 8 cannot be considered as extending to a general obligation on the part of a contracting state to respect the choice by married couples of the country of their matrimonial residence and to accept the non-national spouses for settlement in that country.'

In this case, the applicants had not shown that there were obstacles to establishing family life in their own (the applicants were non-United Kingdom national women with rights of residence there) or their husbands' (their husbands were non-United Kingdom nationals with no right of residence there) home countries. If any future case could not be dealt with on the basis of a conflict with the state's duties under Article 14 (as this case was), then the *Abdulaziz* case leaves it open to a woman or a child to show why they could not enjoy family life in the country of their husband's or father's residence. The strongest cases are where the Convention state members of the family have no right in the law of the alien member state to join him there. . . . Otherwise, the obstacles to the family members joining the other outside the Convention state will have to be substantial—economic or cultural disadvantage will generally be insufficient. That Convention rights would not be enjoyed there ought to be a more compelling reason—whether a woman, unwilling to do so, would have to submit to Islamic regime in the place of her husband's right of residence might be an example. In addition to drawbacks, arising in the state of the husband's residence, advantages not available there but available to family members in the Convention state, such as imperative medical treatment might constitute an obstacle to establishing effective family life abroad. It is suggested that the Commission and Court ought to keep the test of sufficient hardship distinct from that of

Article 3, to take into account that what is at stake is the family relationship and not just the likely treatment of one individual.

The duty to respect family life may be stronger where family life has already been established in the state and stronger still where it has been established there for some time. Where the state then seeks to remove a family member who has no right to stay, *he,* as well as the other members of the family, will be able to assert a right to respect for his family life. If the deportation of the family member makes the maintenance of family life practically impossible, then the obligation to respect family life will exclude the removal of the applicant. In *Berrehab v. Netherlands,* the applicant was a Moroccan national whose right to stay in the Netherlands was dependent on him being the husband of a Dutch national. The Court decided that the failure of the Netherlands authorities to grant the applicant a residence permit after their divorce did not respect his family ties with his daughter, since contact with her at the level he had previously enjoyed would have been impracticable following his expulsion. The principle was extended in *Moustaquim v. Belgium* where a deportation order served on a young Moroccan national, who was a second generation immigrant in Belgium, was held to violate his right under Article 8(1). The applicant had been brought to Belgium by his parents as an infant and, besides his parents, seven brothers and sisters lived in Belgium. Moustaquim was able to demonstrate strong family attachments. It was not suggested that the remainder of the family depart with the applicant. Accordingly, his family life could be enjoyed only in Belgium and the unwillingness of the authorities to allow him to stay violated his right to respect for family life. Similarly in *Beldjoudi v. France,* the Court considered that the deportation from France of a long-settled Algerian national would fail to respect his family life enjoyed in France with his French national wife. The judgment gives special protection to aliens who have established family life in a Convention state and Judge Martens went so far as to suggest the assimilation of 'integrated aliens' and nationals. The *Beldioudi* case switches the relevance of the possibility of family life being enjoyed under Article 8(2). The right to respect for family life for an alien in a Convention state embraces a right to remain, dependent on the demonstration that he has a long and well established family life there. This right, it now appears to be the case, is independent of the conditions in the state to which removal is proposed. The state's obligation to respect with such well-established family life is to allow it to continue where it has been enjoyed. It is a different question whether it might justifiably interfere with the continued enjoyment of family life within the terms of Article 8(2) and it is here that the conditions in the state of destination become relevant. Whilst it sometimes seems as though an applicant in this kind of case is complaining about an interference in breach of a negative obligation (the deportation order), what he is really seeking is a positive benefit, the right to stay in the state in order to enjoy his family life.

D.J. Harris, M. O'Boyle and C. Warbrick, Law of the European Convention on Human Rights 331–34 (1995) (citations omitted); *see also, Council of Europe Press, European Convention on Human Rights, Collected Texts* (1995) (showing adherences, declarations and reservations by country and dates); *cf.,* 28 U.S.C. § 994(d) (federal sentencing context; family ties may be considered with respect to "the nature, extent, place of service, or other incidents of an appropriate sentence"); 18 U.S.C. § 3553; *United States v. Johnson,* 964 F.2d 124, 128–29 (2d Cir. 1992) (extraordinary family circumstances are a valid reason for a downward departure in federal sentencing; "we are reluctant to wreak extraordinary destruction on dependants who rely solely on the defendant for their upbringing"); *United States. v. Rose,* 885 F.Supp. 62, 63 (E.D.N.Y.1995).

Particularly with respect to expulsion of aliens, the European Convention on Human Rights is having an impact on internal law of the European Nations since international human rights provisions are part of each nation's law. *See generally* Murray Hunt, Us-

ing Human Rights Law in English Courts, 153, 235, 241, 243, 247 (1997). This is much the same process as the United States went through when the Federal Supremacy clause was first applied to the states. *See, e.g., id.* at 59; Louis Henkin, Richard Crawford Pugh, Oscar Schachter and Hans Smit, International Law: Cases and Materials 203, 679 (3d ed.1993).

The Restatement (Third) of the Foreign Relations Law of the United States (1987) contains over a score of main entries on the protection of aliens in the United States. The comments and supporting notes are too extensive to quote, but among the black letter rules are the following:

§ 721. Applicability of Constitutional Safeguards

The provisions of the United States Constitution safeguarding individual rights generally control the United States government in the conduct of its foreign relations as well as in domestic matters, and generally limit governmental authority whether it is exercised in the United States or abroad, and whether such authority is exercised unilaterally or by international agreement.

§ 722. Rights of Aliens

(1) An alien in the United States is entitled to the guarantees of the United States Constitution other than those expressly reserved for citizens.

(2) Under Subsection (1), an alien in the United States may not be denied the equal protection of the laws, but equal protection does not preclude reasonable distinctions between aliens and citizens, or between different categories of aliens.

In addition to the individual rights of the alien, the state of which he is a national may pursue remedies against the United States for abuse of its national's rights under United States or International Law. *See id.* § 701 (Obligation to Respect Human Rights); § 711 (State Responsibility for Injury to Nationals of Other States); § 712 (State Responsibility for Economic Injury to Nationals of Other States); § 713 (Remedies for Injury to Nationals of Other States); § 902 (Interstate Claims and Remedies).

The above exposition relates to interpretation of statutes in the light of developing human rights law of which Congress will take cognizance. Petitioners go further and argue that if the statutes here at issue were to be interpreted to mean what the government says they mean, the United States could not give them that meaning without violating its international obligations. It is unnecessary to rely upon that position, which is summarized briefly below.

Petitioner's argument relies on Article 13 of the International Covenant on Civil and Political rights, which provides, as already noted, that an alien facing expulsion "shall ... be allowed to submit reasons against his expulsion and to have his case reviewed by ... competent authority...." Article 13, it is alleged, violates petitioners' right to a statutory section 212(c) merits hearing clearly available prior to enactment of the AEDPA.

"In the absence of a congressional enactment, United States courts are 'bound by the law of nations, which is a part of the law of the land.'" *Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980) (quoting *The Nereide,* 13 U.S. (9 Cranch) 388, 422, 3 L.Ed 769 (1815)). In *Filartiga,* the plaintiffs filed a tort action in federal court. The action did not arise directly under a treaty of the United States. *Filartiga,* 630 F.2d at 880. Thus, the court first had to decide whether the alleged conduct violated the law of nations. The court found that the conduct did violate international law.

The *Filartiga* court noted that in *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900), "a standard that began as one of comity only, had ripened ... into 'a settled rule of international law' by 'the general assent of civilized nations.'" *Filartiga,* 630 F.2d at 881 (quoting *Habana,* 175 U.S. at 694, 20 S.Ct. at 297). Therefore, "the courts must interpret international law ... as it has evolved and exists among the nations of the world today." *Filartiga,* 630 F.2d at 881. The requirement of "the general assent of civilized nations" ensures that laws not found universally cannot be claimed a binding international law. *See id.* One of the authorities to which the *Filartiga* court looked was the United Nations. The court cited the

Universal Declaration of Human Rights, General Assembly Resolution 217(III)(A) (Dec. 10, 1948), as a source of customary international law. *Id.* at 882. It also relied upon the Declaration on the Protection of All Persons from Being subjected to Torture, General Assembly Resolution 3452, 30 U.N. GAOR Supp. (No. 34) 91, U.N. Doc. A/1034 (1975). Although these covenants were enacted less than fifty years ago, the court considered them part of universally accepted international customary law.

■ Article 9, paragraph (4) of the International Covenant on Civil and Political Rights 6 I.L.M. 368 (1967), signed by the United States on October 5, 1977, mandates that "[a]nyone who is deprived of his liberty by ... detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful." Article 9, petitioners argue, has a direct bearing on the instant case, because Mojica and Navas claim they are being deprived of their liberty. There exists, they submit, within the United States a mechanism to ensure that persons unlawfully detained can contest detention in court—petitions for writs of habeas corpus. To construe the AEDPA and the IIRIRA in a manner that deprives the petitioners of the opportunity to have their petitions entertained would arguably be to violate the International Covenant on Civil and Political Rights. In any event, as already noted, under the law of the Second Circuit, as well as under Supreme Court precedent, where a statute can be construed so as to avoid conflict with international law, it should be so construed.

It is not necessary to decide the merits of petitioners' argument on the binding effect of international law. To ensure that United States law does not conflict with international law, " 'an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains....' " *Filartiga v. Pena-Irala,* 630 F.2d 876, 887 (2d Cir.1980) (quoting *The Charming Betsy,* 6 U.S. (2 Cranch) 64, 2 L.Ed. 208 (1804), quoted *in Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926–27, 97 L.Ed. 1254

(1953)). *See also, e.g.,* Richard B. Lillich and Horst Hannum, International Human Rights, Problems of Law, Policy and Practice 157, 159, 160, 272 (3d ed.1995); *cf.* Judicial Conference, Second Circuit, 170 F.R.D. 312–318 (1997) (public debate by members of Court of Appeals, Second Circuit on effect of treaties and human rights law on internal law of United States).

### C. Habeas Corpus

The writ of habeas corpus is an ancient instrument of common law jurisprudence dating back to the early days of post-Norman Conquest England. *See* Developments in the Law: Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1042 (1970). In subsequent centuries common law courts used the writ, in one form of another, as a means of ensuring liberty to individuals held by authority of competing English judicial institutions. *Id.* at 1043. Of critical importance to Americans in the history and development of the writ of habeas corpus is that, "[w]hile the [English] Habeas Corpus Act was never extended to the American colonies, the writ as a part of the common law was considered to be the heritage of every Englishman." *Id.* at 1045. Without any affirmative statute granting the right to the writ of habeas corpus, in the years immediately proceeding the formation of the United States, the Great Writ had already been woven into the fabric of the English common law inherited by the former American colonies.

From its earliest days, the Supreme Court has emphasized the central role of the writ of habeas corpus in Anglo–American jurisprudence in protecting individual liberty:

> The general power of issuing this great remedial writ [of habeas corpus], is incident to this court as a supreme court of record. It is a power given to such a court by the common law. Every court possesses necessarily certain incidental powers as a court. This is proved by every day's practice. If this court possessed no powers but those given by statute, it could not protect itself from insult and outrage. It could not enforce obedience to its immediate orders. It could not imprison for contempts in its presence. It could not com-

pel the attendance of a witness, nor oblige him to testify. It could not compel the attendance of jurors, in cases where it has original cognizance, nor punish them for improper conduct. These powers are not given by the constitution, nor by statute, but flow from the common law.... The power to punish offences against the government is not necessarily incident to a court. But the power of issuing writs of habeas corpus, for the purpose of relieving from illegal imprisonment, is one of those inherent powers, bestowed by the law upon every superior court of record, as incidental to its nature, for the protection of the citizen.

.... The common law, in short, forms an essential part of all our ideas. It informs us, that the power of issuing the writ of habeas corpus belongs incidentally to every superior court of record; that it is part of their inherent rights and duties thus to watch over and protect the liberty of the individual.

*Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 79–80, 2 L.Ed. 554 (1807). The *Bollman* Court admitted "that for the meaning of the term habeas corpus, resort may unquestionably be had to the common law; but the power to award the writ by any of the courts of the United States, must be given by written law." *Id.* at 93–94. As if to minimize the potential threats to liberty inherent in such a conclusion, the Court quickly went on to affirm the grant of authority to issue writs of habeas corpus in the Judiciary Act of 1789. It noted,

that this act was passed by the first congress of the United States, sitting under a constitution which had declared 'that the privilege of the writ of habeas corpus should not be suspended, unless when, in cases of rebellion or invasion, the public safety might require it.' Acting under the immediate influence of this injunction, they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they give, to

all the courts, the power of awarding writs of habeas corpus.

*Id.* at 95–96. The *Bollman* Court was by no means the only early nineteenth century Court to review the history of the writ of habeas in describing the writ's importance:

The writ of habeas corpus is a high prerogative writ, known to the common law, the great object of which is the liberation of those who may be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment. The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ when issued was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial. To remedy this evil the celebrated habeas corpus act of the 31st of Charles II. was enacted, for the purpose of securing the benefits for which the writ was given.

*Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202, 7 L.Ed. 650 (1830).

Subsequently the Supreme Court explained:

To determine whether habeas corpus could be used to test the legality of a given restraint on liberty, this Court has generally looked to common-law usages and the history of habeas corpus both in England and in this country.

*Jones v. Cunningham*, 371 U.S. 236, 237, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963).

Again and again our courts have emphasized that the writ of habeas corpus is part of the very core of constitutional liberties that protect those within our borders. In a case involving unlawful search and seizure, Justice Jackson described "the most fundamental distinctions between our form of government ... and the police-state," *Johnson v. United States*, 333 U.S. 10, 17, 68 S.Ct. 367, 371, 92 L.Ed. 436 (1948), in the following terms:

It would not be possible to add to the emphasis with which the framers of our Constitution and this court have declared

the importance to political liberty and to the welfare of our country of the due observance of the rights guaranteed under the Constitution by these two Amendments. [The legacy of the Constitution and constitutional jurisprudence is] [t]hat such rights are declared to be indispensable to the full enjoyment of personal security, personal liberty, and private property; that they are to be regarded as the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as the guaranties of the other fundamental rights of the individual citizen——the right to trial by jury, to the writ of habeas corpus, and to due process of law."

*Id.,* 333 U.S. at 17 n. 8, 68 S.Ct. at 371 n. 8, 92 L.Ed. 436 (internal citations and quotation marks omitted). Echoing this sentiment in a case involving a criminal violation of the Federal Tax Code, a district court reviewed fundamental constitutional rights:

Among the large number of individual rights guaranteed by the federal Constitution are those against unreasonable searches and seizures and self-incrimination and those affirming the rights to counsel and to habeas corpus. These rights have two characteristics in common: all extend to aid the individual in extra-judicial contact with the government; all are directed to the preservation of the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of (the people's) personal and private affairs.

*United States v. Tarlowski,* 305 F.Supp. 112 (E.D.N.Y.1969).

The critical nature of the right to habeas corpus is reviewed in a dissent by Justice Rutledge joined by Justice Black and Justice Murphy. Soon after the Second World War, expressing concern at the majority's holding that territorial jurisdiction is a prerequisite to filing a petition for a writ of habeas corpus with a district court, Justice Rutledge wrote: "[T]he experience of less fortunate countries should serve as a warning against the unwarranted curtailment of the jurisdiction of our courts to protect the liberty of the individual by means of the writ of *habeas corpus.*"

*Ahrens v. Clark,* 335 U.S. 188, 210, 68 S.Ct. 1443, 1454, 92 L.Ed. 1898 (1948).

The ancient and continued fundamental importance of the availability of habeas corpus cannot be ignored:

Habeas corpus is meant to be "efficacious ... in all manners of illegal confinement." [William Blackstone, Commentaries 129 (6th ed. 1775).] Yet if the writ is to be an efficacious check on the confinement and deprivation of liberty attending physical removal of persons from the United States, judicial review of [deportation and] removal orders must not be precluded. Ultimately, habeas corpus functions to "insure the integrity of the process" by which the state deprives individuals of their liberty. [William F. Duker, A Constitutional History of Habeas Corpus 3 (1980).] If the integrity of the American legal system is to be insured, the Great Writ must be extended to all whose liberty the state might deprive.

Trevor Morrison, Note, Removed from the Constitution?: Deportable Aliens Access to Habeas Corpus Under the New Immigration Legislation, 35 Colum. J. Transnat'l L. 697, 721–22 (1997).

This brief review of the importance of habeas corpus ends with a reminder from the last century pertaining to any threat to individual liberty:

It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed.

*Boyd v. United States,* 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886).

### D. Presumption Against Retroactivity

Anglo-American law has long presumed that in the absence of explicit language, new statutes may be applied only prospectively. This legal presumption predates the forma-

tion of our nation and has been incorporated into the American legal system from its inception. *See, e.g., Landgraf v. USI Film Products*, 511 U.S. 244, 266 n. 17, 114 S.Ct. 1483, 1497 n. 17, 128 L.Ed.2d 229 (1994) (quoting Kent, C.J., *in Dash v. Van Kleeck*, 7 Johns 477, 503 (N.Y.1811) ("It is a principle of the English common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have retrospective effect"). Chief Justice John Marshall explained the presumption in favor of prospective effect of statutes:

It is a principle which has always been held sacred in the United States, that laws by which human action is to be regulated look forwards, not backwards; and are never to be construed retrospectively unless the language of the act shall render such construction indispensable.

*Reynolds v. McArthur*, 27 U.S. (2 Pet.) 417, 7 L.Ed.470 (1829).

This core principle, essential for just and legitimate governance, has been reiterated throughout the last two centuries. *See e.g., Landgraf v. USI Film Products*, 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. . . ."); *Union Pacific R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 202, 34 S.Ct. 101, 104, 58 L.Ed. 179 (1913) ("The principle of these cases [on statutory construction] forbids a retrospective operation to be given to the statute under consideration. To do so would cause in a high degree the evil and injustice of retroactive legislation."); *Winfree v. Northern Pac. Ry. Co.*, 227 U.S. 296, 302, 33 S.Ct. 273, 274, 57 L.Ed. 518 (1913) (statute "should not be construed as retrospective [because i]t introduced a new policy and quite radically changed the existing law").

### E. Judicial Review of Administrative Actions

 The judiciary is often called upon to review the administrative execution of laws passed by Congress. The determination of the level of deference due to an administrative interpretation of the laws involves a dual inquiry. The court must decide whether to apply the agency's statutory construction. *Chevron v. Natural Resources Defense*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Alternatively, the court must determine whether the question involves the kind of interpretation that is the sole province of the judiciary. Regardless of the approach, any action taken by an agency must fail if it is arbitrary and capricious.

 In *Chevron*, the Supreme Court provided a basic standard:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the Court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron v. Natural Resources Defense*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). This two-step analysis provides a method for determining "the issue of the appropriate role of courts when they review agency resolutions of *policy* issues." 1 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 1.7 (3d ed.1994) (emphasis supplied). Where the agency decision is one of policy, the court is instructed to defer to any "reasonable" agency decisions. *Chevron*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although, "[t]he second step of *Chevron* has provoked great controversy among judges and scholars," (1 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 1.7 (3d ed.1994)), there is no question that agency decisions that are irrational and

unreasonable will not be upheld. The basic proposition that the judiciary will not give weight to the actions of administrative agencies that "are arbitrary, capricious, or manifestly contrary to the statute" is uncontroverted. *INS v. Cardoza Fonseca,* 480 U.S. 421, 444 n. 29, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987); *see generally, e.g.,* Richard J. Pierce, Jr., et al., Administrative Law and Process 111–129 (2d ed.1992).

■■ In contrast to discretionary policy questions left open in legislation to administrative interpretation, questions of statutory construction are for the judiciary. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). For the last two centuries, this maxim has provided a touchstone in judicial review. While "[i]n the performance of assigned constitutional duties each branch of the government must initially interpret the Constitution," *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974), ultimately the final word on the interpretation of the supreme law of the land, the Constitution, and of congressionally enacted statutes must come from the judiciary. As the *Chevron* Court itself recognized, "The judiciary is the final authority on issues of statutory construction. . . ." *Chevron v. Natural Resources Defense,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). Where courts must rely on common law principles of statutory construction as interpreted by the Supreme Court, "[t]here is . . . no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the Court's opinions." *Akins v. Federal Election Comm'n,* 101 F.3d 731, 741 (D.C.Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 2451, 138 L.Ed.2d 210 (1997).

■ Finally, any action taken by an administrative agency may be reviewed under the arbitrary and capricious test. The Supreme Court's initial and most deferential statement of the rule required that an administrative action must be upheld "if any state of facts reasonably can be conceived that would sustain" the agency's decision. *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185, 56 S.Ct. 159, 163, 80 L.Ed. 138 (1935). "[T]his formulation [is similar to] what has become known as the loose rational relation test [in constitutional law]. The court continues to use this exceptionally deferential version of the arbitrary and capricious test in some important areas of judicial review" in areas of law not relevant to the instant case. 2 Kenneth Culp Davis, Richard J. Pierce, Jr., Administrative Law Treatise § 11.4 (3d ed.1994). Modern case law supports much closer judicial scrutiny. *See, e.g., Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The exact meaning of "arbitrary and capricious" remains unclear, but in the context of INS decisions, a court must rely on guidance provided by the court of appeals for the Second Circuit. An "inadequate basis for the decision [is an important factor in determining] that the [Board of Immigration Appeals] acted in an arbitrary and capricious manner." *Vargas v.INS,* 938 F.2d 358, 362 (2d Cir.1991).

In reviewing the actions taken by the INS, following the orders of the Attorney General, with respect to Mojica and Navas, a court will have to make the following determinations: First, has the INS made reasonable policy determination in interpreting the ambiguous sections, if any, of the AEDPA? Second, with respect to any questions relating strictly to statutory construction, what is the proper construction relying on common law principles and judicial interpretations of those principles? Finally, considering the actions that the INS took with respect to Mojica and Navas, were any findings necessary to support those actions arbitrary or capricious?

## IV. Jurisdiction

### A. Subject Matter Jurisdiction

■ This case presents jurisdictional issues of great moment. If a district court has habeas corpus jurisdiction and venue is proper under sections 1391 and 2241 of title 28, it also is competent to issue a declaratory judgment. 28 U.S.C. §§ 2201, 2202; Charles A. Wright, Law of Federal Courts 712–20 (5th ed.1994).

■ The government contends that this court lacks subject matter jurisdiction over these petitions to consider the retroactivity of AEDPA section 440(d). Relying on jurisdiction-modifying provisions of the AEDPA and the IIRIRA, the government asserts that the only remaining judicial review relating to final orders of deportation for legal permanent resident criminal aliens such as petitioners is in the court of appeals, and that such review is available only for substantial constitutional claims. As the petitioners' claims are not of the substantial constitutional variety, the government avers, they cannot be reviewed by any court.

Petitioners, in contrast, assert that this court does have jurisdiction to consider their claims. They point out that the theory of jurisdiction that the government urges upon the court would bar them from obtaining judicial review on a straight question of law——the proper statutory construction of AEDPA section 440(d). Petitioners argue that the refusal of the Immigration Judge (with respect to Mojica) and the Board of Immigration Appeals (BIA) (with respect to both petitioners) to consider the merits of petitioners' section 212(c) applications, as a matter of law, was based on a misconstruction of the effective date of AEDPA section 440(d). Petitioners neither seek review of discretionary determinations nor revisitation of administrative factual findings; they challenge an interpretation of law. Accordingly, the court need not decide whether there is jurisdiction to review discretionary determinations or findings of fact. *See United States v. Shaughnessy,* 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957).

Petitioners argue that the government's tendered construction of judicial review under AEDPA is implausible. If the government's position were to be accepted, it would present a situation in which the deportation process for them and others like them, from beginning to end, would be entrusted solely to the executive branch without any opportunity for correction of legal errors, except those of "substantial constitutional" proportion. They assert that Congress, in enacting the AEDPA and the IIRIRA, did not vest the Attorney General with unreviewable and

absolute power to deport legal permanent residents. The government's interpretation would call into question the most basic tenets of out tripartite system of government which has since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), assigned to the judiciary the final responsibility for interpreting the law.

Petitioners' argument is persuasive. The government is incorrect as a matter of statutory construction. Congress could not have intended the result that the government's position ordains.

■ The court retains subject matter jurisdiction under its general habeas corpus powers, which Congress did not eliminate. The statutory changes wrought by the AEDPA and the IIRIRA bar the judicial review that was once available pursuant section 106 of the Immigration and Nationality Act, section 1105a(a)(10) of Title 8 of the United States Code. *See* AEDPA § 401(e) (eliminating the old INA § 106, 8 U.S.C. § 1105a(a)(10)); AEDPA § 440(a) (providing for a new INA § 106, 8 U.S.C. § 1105a(a)(10)); IIRIRA § 306(b)–(c) (repealing INA § 106, 8 U.S.C. § 1105a with respect to actions filed on or after Sept. 30, 1996). While the amendments manifest Congress's desire to streamline the deportation process, the AEDPA and the IIRIRA leave undisturbed the independent authority of federal district courts to entertain habeas petitions under section 2241 of Title 28. The reasons for this conclusion are demonstrated below.

Because this issue is one of statutory interpretation, petitioners' constitutional arguments based on the Suspension Clause, the Due Process Clause, and the Separation of Powers principles embodied in Article III of the Constitution need not be reached. *But see,* Note, The Constitutional Requirement of Judicial Review for Administrative Deportation Decisions, 110 Harv. L.Rev. 1850 (1997).

### (1) Statutory Background

### (a) Section 2241 of Title 28

Section 2241 of Title 28 of the United States Code establishes federal courts' power

to grant the writ of habeas corpus. It provides in relevant part that:

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions.

. . . .

(c) The Writ of habeas corpus shall not extend to a prisoner unless—

(1) He is in custody under color or by color of the authority of the United States or

. . . .

(3) He is in custody in violation of the Constitution or laws or treaties of the United States . . .

28 U.S.C. § 2241(a), (c)(1), (c)(3). Section 2241 is the direct descendant of section 14 of the Judiciary Act of 1789 and the 1867 Act which expanded the scope of the writ. *See,* Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82; Act of Feb. 5, 1867, ch. 28, 14 Stat. 385; *see also Felker v. Turpin,* — U.S. —, —, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996).

### (b) INA Section 106(a), The AEDPA, and The IIRIRA

Legal permanent residents have always had the right to test the legality of their deportation orders before an Article III court. Until the enactment of the 1952 Immigration Act, the procedure for doing so was by means of a habeas corpus action in district court. *See Heikkila v. Barber,* 345 U.S. 229, 235, 73 S.Ct. 603, 605–06, 97 L.Ed. 972 (1953) ("Now, as before, [an alien] may attack a deportation order only by habeas corpus."). After 1952, an alien could challenge a deportation order in habeas actions as well as in an action for declaratory relief pursuant to the Administrative Procedure Act (APA). *See Shaughnessy v. Pedreiro,* 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955).

The Immigration Act of 1961 amended the INA, substantially altering the system of judicial review and establishing the regime that remained in place until the recent amendments. Specifically, the 1961 Act sought to eliminate the APA declaratory actions. In

their stead section 106(a) of the INA provided that petitions for review before the courts of appeal "shall be the sole and exclusive procedure for judicial review of all final orders of deportation except" as provided elsewhere in the section. 8 U.S.C. § 1105a (amended Apr. 24, 1996 by AEDPA §§ 401(e), 440(a), and prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)). Sub-section (a)(10) of section 1105a authorized habeas corpus review:

(10) Habeas Corpus

[A]ny alien held in custody pursuant to an order of deportation may obtain judicial review thereof by habeas corpus proceedings.

8 U.S.C. § 1105a(a)(10) (amended Apr. 24, 1996 by AEDPA §§ 401(e), 440(a), and prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)).

On April 24, 1996, the AEDPA became law. Section 401(e) of the Act, entitled "Elimination of Custody Review by Habeas Corpus," struck the habeas corpus provision of INA section 106(a). AEDPA Section 440(a) substituted new language: "Any final order of deportation against an alien who is deportable by reason of having committed [certain crimes] shall not be subject to review by any court." AEDPA § 440(a), 110 Stat. 1276–77 (1996) (amending and codified at 8 U.S.C. § 1105a(a)(10) which paragraph was prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)).

There was no mention of section 2241 of Title 28 in the AEDPA.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") was enacted on September 30, 1996 and further amended the procedures governing judicial review of deportation orders. *See generally* IIRIRA § 306(a), Pub.L. No. 104–208, 110 Stat. 3009 (Sept. 30, 1996). The IIRIRA contains two sets of provisions, transitional and permanent. The permanent changes made by the Act govern deportation proceedings commenced after April 1, 1997. *See* IIRIRA § 309(c). The transitional provisions, which are not codified in the United States Code, apply to deportation proceedings commenced before April 1, 1997, where

the deportation order became administratively final after October 30, 1996. *See* § 309(c)(4). A deportation order that became administratively final on or before October 30, 1996 is governed by the Immigration and Naturalization Act, as amended through September 30, 1996.

■ Because petitioners' deportation orders became administratively final after October 30, 1996, their cases are governed by the IIRIRA's transitional rules, specifically section 309(c)(4)(G). Section 309(c)(4)(G) provides that "there shall be no appeal permitted in the case of an alien who is inadmissible or deportable by reason of having committed" one of the enumerated crimes. Because each of the petitioners committed one of the enumerated crimes, they are subject to section 309(c)(4)(G).

■ Neither the IIRIRA's transitional rules, nor its permanent provisions, specifically address or amend the habeas jurisdiction of the district courts under section 2241 of Title 28.

### (2) Habeas Corpus Jurisdiction Under Section 2241 Not Repealed

■ The interplay between section 2241 and the recently enacted modifications of judicial review implicates the clear statement rule—a rule governing repeals of habeas jurisdiction. Almost one-hundred thirty years ago, and again last year, the Supreme Court explicitly admonished that congressional intent to repeal habeas jurisdiction must be express and that "[r]epeals by implication are not favored." *Felker v. Turpin*, —— U.S. ——, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996); *see also Ex Parte Yerger*, 75 U.S. 85, 105, 19 L.Ed. 332, 8 Wall. 85 (1868). In both *Felker* and *Yerger* the Court refused to read jurisdiction-modifying statutes enacted by Congress as repealing other avenues of habeas jurisdiction that had not been specifically abrogated, much less mentioned, by those jurisdiction-modifying statutes. Only upon a clear statutory statement—a specific, express and unambiguous directive—can a court conclude that Congress meant to repeal an independent avenue of habeas jurisdiction. Such a clear statement is absent from the governing statutes in the present case.

*Yerger* involved the scope of a Congressional limitation on the appellate jurisdiction of the Supreme Court. In 1867 Congress expanded power of the federal courts to issue writs of habeas corpus, allowing such writs "in all cases where any person may be restrained of his or her liberty in violation of the constitution, or any treaty or law of the United States." *See* Act of Feb. 5, 1867, ch.28, 14 Stat. 385. The same legislation also expanded the appellate jurisdiction of the Supreme Court, authorizing appeals from any final decision of the circuit courts on a habeas petition. *See id.*, 14 Stat. 386. The following year Congress retreated and revoked this appellate jurisdiction, repealing " 'so much of the [1867] act ... as authorized an appeal from the judgment of the Circuit Court to the Supreme Court of the United States.' " *See Ex Parte Yerger*, 75 U.S. 85, 87, 19 L.Ed. 332, 8 Wall. 85 (1868) (quoting Act of March 27, 1868, ch.34 § 2, 15 Stat. 44).

The question considered by the *Yerger* Court was whether the 1868 Act also revoked the Supreme Court's power to entertain habeas petitions under section 14 of the Judiciary Act of 1789. The Court held that it did not, explaining that the text of the 1868 Act addressed only jurisdiction over appeals conferred by the 1867 Act and that it made no reference to habeas jurisdiction under the 1789 Act.

Last year in *Felker* the Court—in considering the validity of an AEDPA jurisdiction-modifying provision unrelated to the provision here at issue—reaffirmed the rule against repeals by implication. Specifically, it held that while the AEDPA "gatekeeping" provision—section 106(b)(3)(E)—legitimately precluded review by appeal or petition for certiorari of a denial of an application for leave to file a second or successive habeas petition in district court, the Act could not be read to foreclose the section 2241 avenue of original habeas review. Noting the parallels to *Yerger*, the Court unanimously held that since the AEDPA "makes no mention of our authority to hear habeas petitions filed as original matters in this Court ... we decline to find a ... repeal of § 2241 of Title 28 ... by implication ...." *Felker v. Turpin*, ——

U.S. ——, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996).

The instant case involves an issue not dissimilar to those confronted by the *Yerger* and *Felker* Courts: whether recent jurisdiction-modifying amendments to the INA repeal by implication an independent and unrelated statutory source of jurisdiction—section 2241 of Title 28—thereby depriving courts of this long-established habeas jurisdiction.

As noted, the AEDPA amended the INA, with section 401(e) deleting the habeas provision providing a method for judicial review of deportation orders by habeas corpus proceedings and section 440(a) inserting new language establishing that deportation orders against aliens convicted of certain crimes "shall not be subject to review by any court." *See* AEDPA §§ 401(e), 440(a). Similarly, IIRIRA section 309(c)(4)(G)—the interim amendment of INA section 106—provided that "there shall be no appeal permitted" in the case of certain criminal aliens and new INA section 242(g), codified at section 1252 of Title 8 of the United States Code, added by IIRIRA section 306, provided that "no court shall have jurisdiction ... except as provided in" this section. *See* IIRIRA §§ 306, 309. It is clear that, by these provisions, Congress intended to speed the process of deportation of criminal aliens by restricting judicial review of final orders of deportation.

Nevertheless, as was the case in *Yerger* and *Felker*, there is no indication that Congress intended to take the dramatic—and arguably unconstitutional—step of repealing the habeas statute with roots traceable to our nation's beginnings. *See, e.g.,* Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat. 82 (ancestor of section 2241(a) of Title 28); Act of Feb. 5, 1867, ch.28, 14 Stat. 385 (ancestor of section 2241(c)(3) of Title 28); *see also Ex Parte Yerger,* 75 U.S. 85, 95, 19 L.Ed. 332, 8 Wall. 85 (1868) ("The great writ of habeas corpus has been for centuries esteemed the best and only sufficient defense of personal freedom"). *See also,* Trevor Morrison, Note, Removed from the Constitution?: Deportable Aliens Access to Habeas Corpus Under the New Immigration Legislation, 35 Colum. J. Transnat'l L. 697, 718–19 (1997) (arguing that

AEDPA and "IIRIRA must ... either be read as permitted habeas-based challenges to removal orders or be struck down as unconstitutional."). The AEDPA does not amend, or even mention, section 2241 of Title 28. Nor does the IIRIRA.

In keeping with *Felker* and *Yerger,* the court cannot here find that Congress repealed section 2241 by implication. *See, e.g., Ojo v. INS,* 106 F.3d 680, 681 (5th Cir.1997) (holding that AEDPA cannot be interpreted to have altered requirements *by implication* for habeas review sought pursuant to section 2241 of Title 28); *cf. Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984) ("where two statutes are 'capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective'") (citations omitted).

■ Congress is expert in the process of law-making. Had it desired to repeal section 2241, or render it inapplicable to challenges to deportation orders, it would have taken the necessary steps to do so. It must be presumed that Congress was mindful of the necessity for a clear statement to that effect. Congress is presumed to "know the law." *See generally, Director, OWCP v. Perini North River Associates,* 459 U.S. 297, 319, 103 S.Ct. 634, 648, 74 L.Ed.2d 465 (1983); *see also Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979) (same). As the *Felker* Court acknowledged, Congress knows how to repeal habeas jurisdiction. Where it intends to do so, it states that intention expressly. *See Felker v. Turpin,* —— U.S. ——, ——, 116 S.Ct. 2333, 2338, 135 L.Ed.2d 827 (1996) (AEDPA section 103 expressly eliminated original habeas jurisdiction in the courts of appeals by amending Federal Rules of Appellate Procedure.). This—as Congress is doubtless aware—is the purpose of the clear statement rule: courts do not have to resort to divining phantom or unarticulated congressional intentions to repeal habeas jurisdiction where there is statutory silence. In

the wake of the AEDPA and the IIRIRA, section 2241 remains a viable basis for habeas jurisdiction.

Other cases interpreting the AEDPA amendments are consistent with this conclusion. Courts have noted that despite the AEDPA's withdrawal of jurisdiction, "some means of seeking judicial relief remain[s] available." *Yesil v. Reno,* 958 F.Supp. 828, 837 & n. 7 (S.D.N.Y.1997) (citing cases); *see Hincapie–Nieto v. INS,* 92 F.3d 27, 30–31 (2d Cir.1996) ("at least some avenue of judicial relief remains available"; "we express no opinion on the nature of the remedy or the scope of review that remains available in any court"); *Kolster v. INS,* 101 F.3d 785, 790–91 (1st Cir.1996) (same); *Salazar–Haro v. INS,* 95 F.3d 309, 311 (3d Cir.1996) ("we do not foreclose judicial review of all claims by aliens arising in the course of deportation proceedings"), *cert. denied,* —— U.S. ——, 117 S.Ct. 1842, 137 L.Ed.2d 1046 (1997). District courts addressing the AEDPA's effect on section 2241 jurisdiction have been almost unanimous in their agreement that section 2241 is available and has not been repealed. *See, e.g., Yesil v. Reno,* 958 F.Supp. 828 (S.D.N.Y.1997); *Eltayeb v. Ingham,* 950 F.Supp. 95 (S.D.N.Y.1997); *Duldulao v. Reno,* 958 F.Supp. 476 (D.Haw.1997); *Dunkley v. Perryman,* 1996 WL 464191 (N.D.Ill.1996); *Mbiya v. INS,* 930 F.Supp. 609 (N.D.Ga.1996); *but see Theck v. INS,* 1997 WL 37565 (N.D.Cal.1997) (dismissal for lack of jurisdiction).

■ From the government's perspective, the conclusion that section 2241 was not repealed by the AEDPA or the IIRIRA is irrelevant because, it argues, it has long been the case that habeas proceedings are not the proper mechanism to challenge final deportation orders. The government's theory is that Congress removed section 2241 as an independent source of habeas jurisdiction in the context of deportation some 35 years ago in enacting the 1961 Immigration Act.

As part of that Act, Congress established procedures in INA section 106(a) providing the "sole and exclusive" mechanism for challenging final deportation orders. In doing so, the government asserts, Congress restricted section 2241's general authorization

of habeas review, rendering it inapplicable to deportation orders. As already demonstrated, section 106(a) of the INA stated (prior to repeal) that petitions for review before the courts of appeal "shall be the sole and exclusive procedure for . . . the judicial review of all final orders of deportation . . . except" as provided elsewhere in the section. *See* INA § 106(a), 8 U.S.C. § 1105a(a) (prospectively repealed Sept. 30, 1996 by IIRIRA § 306(b)–(c)). Until the recent amendments, the "except[ions] provided . . . in this section [106(a) ]" included a provision for habeas corpus. *See* INA § 106(a)(10), 8 U.S.C. § 1105a(a)(10) (as it existed prior to amendments by AEDPA §§ 401(e), 440(a), Apr. 24, 1996, and the prospective repeal by IIRIRA § 306(b)–(c), Sept. 30, 1996). The government points out that, at that time prior to amendment and eventual repeal of section 106(a) of the INA, section 2241 was not referenced as an exception to the "sole and exclusive" procedure, and extrapolates from this omission that Congress effectively repealed (i.e. prohibited the applicability of) section 2241 in the context of final deportation orders, replacing it with habeas corpus review provided by section 106(a)(10). *See* Gov. Mem. at 12 ("with respect to final deportation orders, INA section 106(a)(10)'s authorization of habeas review for aliens in custody was not in addition to, but in substitution for, the general authorization of habeas review at section 2241 ").

Thus, under the government's theory, after the AEDPA repealed the habeas exception at INA section 106(a)(10), the only remaining mechanism for judicial review of final deportation orders is petition for review in the court of appeals. This contention is not persuasive. As with the AEDPA and the IIRIRA, the text of the relevant 1961 legislation is devoid of any reference—abrogating or otherwise—to section 2241 of Title 28. Nor does the legislative history support the government's position. In fact, the house report provides, after having noted that section 106(a) of the INA enumerates habeas corpus petitions as an exception to the "sole and exclusive" procedure, that "[t]he section in no way disturbs the Habeas Corpus Act." *See* H.R.Rep. No. 1086, 87th Cong., 1st Sess.

(Aug. 30, 1961), *reprinted in* U.S.C.C.A.N. 1961, 2950, 2973. The reference to leaving undisturbed the "Habeas Corpus Act" is somewhat ambiguous, but no reasonable interpretation supports the government's view.

The most plausible reading of this reference is that it refers to specifically to section 2241 by its progenitor—the Habeas Corpus Act—and it expresses Congress's intention to leave that section undisturbed. *See Sunal v. Large,* 157 F.2d 165, 168 (4th Cir.1946), *affirmed,* 332 U.S. 174, 67 S.Ct. 1588, 91 L.Ed. 1982 (explaining that section 451 of title 28 [predecessor of section 2241] issued from the Habeas Corpus Act). Another reading is that Congress was merely referring to the INA section 106(a)(10) exception by another name, the "Habeas Corpus Act," and that the report is therefore without any reference to section 2241. The reading that is not plausible is the one that would have to be adopted in order to prop up the government's theory: that the "Habeas Corpus Act" reference is only to the INA section 106(a)(10) habeas exception and that it silently communicates a limitation upon the applicability of section 2241. Because section 2241 is nowhere mentioned—much less in a limiting manner—in other sections of the legislative history, there is no support for such a reading. Thus, similar to the AEDPA and the IIRIRA, the absence of the sort of clear statement required by the *Yerger* and *Felker* Courts to signal the intention to repeal—or amend—an independent source of habeas jurisdiction necessitates that the court reject the government's argument regarding the 1961 Act.

At most, the 1961 Act may have, as a practical matter, suspended application of section 2241 because jurisdiction would be exercised in the first instance by the courts of appeals. When the courts of appeals later lost that jurisdiction, section 2241 was no longer suspended. On this point, it is worth noting that the few courts considering deportation matters and the interplay between the general habeas provision and INA section 106(a)(10) after the 1961 Act and before the enactment of the AEDPA did not read the 1961 Act to foreclose section 2241 jurisdiction. *See e.g., Orozco v. U.S. I.N.S.,* 911 F.2d 539, 541 (11th Cir.1990) (citing *United States*

*ex rel. Marcello v. District Director of Immigration & Naturalization Service,* 634 F.2d 964, 967 (5th Cir.)), *cert. denied,* 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981) ("Challenges to deportation proceedings are cognizable under 28 U.S.C. § 2241."); *Sotelo Mondragon v. Ilchert,* 653 F.2d 1254, 1255 (9th Cir.1980) (finding jurisdiction to review deportation order under INA section 106(a)(10) and section 2241). The government infers that the paucity of cases addressing an alien's ability to bring a habeas action pursuant to section 2241 during this period suggests that section 2241 jurisdiction was not available. Reliance on such a spurious inference is misplaced. The relative absence of case law is indicative of little and is not surprising. On occasions where habeas actions were brought, there was no reason for reviewing courts to focus specifically on whether section 2241 or section 106(a)(10) of the INA was the proper basis for jurisdiction. Nothing turned on the distinction.

The government further argues that prior to the enactment of the AEDPA and the IIRIRA, habeas corpus relief under INA section 106(a)(10) was unavailable to review final orders of deportation. It asserts that it would make little sense for the court to hold that such review is now available under section 2241 particularly on the heels of the AEDPA's elimination of the INA provision providing for habeas review and in light of Congress's desire to streamline the deportation process.

The accuracy of the government's characterization of INA section 106(a)(10) appears debatable. *See, e.g., Garay v. Slattery,* 23 F.3d 744 (2d Cir.1994) (habeas available to review denial of stay; no issue presented regarding availability of habeas review to challenge final order of deportation); *Stevic v. Sava,* 678 F.2d 401, 404 n. 5 (no issue presented regarding availability of habeas review to challenge final order of deportation), *judgment reversed,* 467 U.S. 407, 104 S.Ct. 2489, 81 L.Ed.2d 321 (1984); *See also, Williams v. INS,* 795 F.2d 738, 745 (9th Cir.1986) (affirming habeas jurisdiction to review final order of deportation; "custody" operative); *Sotelo Mondragon v. Ilchert,* 653 F.2d 1254, 1255 (9th Cir.1980) (same); *Unit-*

ed States ex rel. Marcello v. District Director of Immigration & Naturalization Service, 634 F.2d 964, 971–72 (5th Cir.) (same), cert. denied, 452 U.S. 917, 101 S.Ct. 3052, 69 L.Ed.2d 421 (1981).

The fact of the matter is that this question does not need to be settled. Section 2241 of title 28 and the case law interpreting it contain no relevant qualifications or limitations. Even assuming the government's characterization about the limited applicability of INA section 106(a)(10) were true, there is no reason to import those limitations into the distinct context of section 2241 jurisdiction.

### (3) Scope of Section 2241 Habeas Review

 With the exception of the Yesil court, district courts that have held that section 2241 provides a statutory source of jurisdiction to review final orders of deportation have also held that the scope of section 2241 jurisdiction has been narrowed. Generally, these courts have held that section 2241 review must be limited to situations where there is a threat of "a fundamental miscarriage of justice." Eltayeb v. Ingham, 950 F.Supp. 95, 100 (S.D.N.Y.1997); see also, e.g, Mbiya v. INS, 930 F.Supp. 609, 612 (N.D.Ga. 1996) (same; preservation of writ only to extent required by the Constitution); Powell v. Jennifer, 937 F.Supp. 1245, 1252–53 (E.D.Mich.1996) ("grave constitutional error or a fundamental miscarriage of justice").

The rationale for attenuating the scope of section 2241 has been to give voice to Congress's perceived general policy objectives in enacting the AEDPA. "Congress desired to expedite the deportation of criminal aliens and to restrict all judicial review of final orders of deportation to the greatest extent possible," the Mbiya court explained, and thus the AEDPA amendment of INA section 106(a), "strongly suggests that Congress intended to preserve the writ of habeas corpus under § 2241 in these cases only to the extent required by the Constitution." Mbiya v. INS, 930 F.Supp. 609, 612 (N.D.Ga.1996). "A narrow application of § 2241 is necessary to accommodate the balance between an alien's constitutional right to habeas review and Congress's power over matters of immi-

gration." Eltayeb v. Ingham, 950 F.Supp. 95, 100 (S.D.N.Y.1997)

"Accommodation" of general policy goals based on "suggest[ions]" of congressional intent are, however, not appropriate in this context. Fidelity to Felker and Yerger and the requirements of the clear statement rule militates against reading such limitations into the scope of section 2241. By its terms, section 2241 is not limited to constitutional claims or claims of fundamental miscarriage of justice. See 28 U.S.C. § 2241. And as already noted, there is nothing in either the text or history of the AEDPA or the IIRIRA that specifically mentions section 2241, much less limits or repeals it. Felker specifically rejected this type of repeal or limitation by "implication" found by other courts, and thus, given the absence of a specific amendment, the scope of section 2241 remains unaffected. Cf. Yesil v. Reno, 958 F.Supp. 828, 839 (S.D.N.Y.1997) (not reaching question of limitation of habeas jurisdiction to substantial constitutional claims).

Even if the government's interpretation that section 2241 had been truncated by implication were correct, there is no reason to apply its conclusion to a case of first impression—as is this one—construing the statute, rather than to a run-of-the-mill application of that construction.

### (4) Section 2241 Habeas Corpus Jurisdiction Available in Instant Case

### (a) A District Court May Review a Section 2241 Petition

 The government's argument that petitioners have come to the wrong court—and that they should be in the court of appeals if anywhere—is incorrect, having been predicated on the assertion that section 2241 habeas jurisdiction was not available. As explained at length above, section 2241 habeas jurisdiction remains available. In light of the plain language of section 2241, the decision in Hincapie–Nieto v. INS, 92 F.3d 27, 31 (2d Cir.1996) and case law throughout the country, jurisdiction properly lies here.

Section 2241 provides in relevant part as follows: "Writs of habeas corpus may be granted by the Supreme Court, any justice

thereof, the *district courts* and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a) (emphasis added). The statute, by its plain terms, is unambiguous in its grant of jurisdiction to district courts.

In *Hincapie–Nieto,* the court of appeals did not address this precise issue, but the case supports this reading. While the court held that AEDPA 440(a) did repeal that court's jurisdiction to review a final order of deportation where the alien had been convicted of one of the AEDPA-covered crimes, it did so on the express basis that habeas jurisdiction had not been entirely eliminated since "some avenue for judicial relief remains available." *Hincapie–Nieto v. INS,* 92 F.3d 27, 31 (2d Cir.1996). The court neither specified the proper forum nor limited access to particular fora: "We express no opinion on the nature of the remedy or the scope of review that remains available in any court." *Id.* District courts, confronted directly with the same question, have rejected the contention that they lack jurisdiction. *See, e.g., Yesil v. Reno,* 958 F.Supp. 828, 840 (S.D.N.Y. 1997) (finding district court jurisdiction); *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997) (same); *Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996) (same).

### (b) Petitioners in Custody For Habeas Purposes

One of the requirements of section 2241 of Title 28 is that the petitioner be in "custody." It reads, in relevant part, that "[t]he writ of habeas corpus shall not extend to a prisoner unless ... [h]e is in custody in violation of the Constitution or laws or treaties of the United States...." *See* 28 U.S.C. § 2241.

■ Both petitioners meet this requirement. Mojica is, at present, in physical custody. While Navas is not now held physically, he is subject to a final order of deportation and was issued a notice to surrender and is presently released on bond. The law is clear that these facts are sufficient to satisfy the "custody" requirement for purposes of habeas review.

The writ of habeas corpus is not a formalistic remedy whose availability is strictly limited to persons in actual physical restraint.

As the Supreme Court explained in holding that parolees satisfy the "custody" requirement:

> History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally ... sufficient ... to support the issuance of habeas corpus....

*Jones v. Cunningham,* 371 U.S. 236, 240, 83 S.Ct. 373, 375, 9 L.Ed.2d 285 (1963).

> It is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose——the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty.

*Jones,* 371 U.S. at 243, 83 S.Ct. at 377; *see also Hensley v. Municipal Court,* 411 U.S. 345, 351, 93 S.Ct. 1571, 1574 36 L.Ed.2d 294 (1973) (releasing petitioner on own recognizance pending appeal); *Barry v. Brower,* 864 F.2d 294, 296 (3d Cir.1988) ("probationary sentence remained open"); *Pringle v. Court of Common Pleas,* 744 F.2d 297, 300 (3d Cir.1984) (released on parole and bail).

■ In the immigration context courts have also held that physical restraint is not required for habeas jurisdiction. Where the petitioner is subject to a final order of deportation, the "custody" requirement is satisfied, particularly where the alien has been released on condition of posting a bond. *See, e.g., Nakaranurack v. United States,* 68 F.3d 290, 293 (9th Cir.1995) ("so long as he is subject to a final order of deportation, an alien is deemed to be 'in custody' "); *Arias v. Rogers,* 676 F.2d 1139, 1142 (7th Cir.1982) (petitioner released on bond after commencement of deportation proceedings "in custody"); *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 n. 5 (alien released on own recognizance and subject to deportation order "in custody"); *Parco v. Morris,* 426 F.Supp. 976, 978 n. 4 (E.D.Pa.1977) ("where an order of deportation is outstanding the 'custody' requirement for habeas corpus jurisdiction is satisfied"). *See also Flores v. U.S. Immigration and Naturalization Service,* 524 F.2d 627, 629 (9th Cir.1975); *Narayan v. Ilchert,* 799 F.Supp. 1047, 1050 n. 3 (N.D.Cal.1992); *Gur-*

*bisz v. U.S.,* 675 F.Supp. 436, 441 (N.D.Ill. 1987).

■ The government argues that this well-settled case law defining "in custody" is inapplicable in the instant case because the AEDPA and the IIRIRA have eliminated this court's habeas jurisdiction except to the extent required by the Constitution and that the Constitution, as informed by the common law, requires "actual physical detention." On both points, the government is wrong. As discussed, *supra,* this court's section 2241 jurisdiction is unaffected by the AEDPA and the IIRIRA because Congress failed to repeal or amend such jurisdiction explicitly. In addition, even if the Suspension Clause's "custody" requirement were applicable and governed by the common law, the common law does not require actual physical detention. *See Jones v. Cunningham,* 371 U.S. 236, 238–39, 83 S.Ct. 373, 374–75, 9 L.Ed.2d 285 (finding that common law writ did not require actual physical detention).

Here, petitioners are both subject to a final order of deportation and were initially released only on condition of posting a bond. Moreover, Mojica is now in physical custody, and Navas is subject to a notice to surrender and has been released on $2,000 bond. They satisfy the "in custody" requirement for purposes of habeas review.

In sum, all the conditions necessary for the court to exercise subject matter jurisdiction over petitioners' claims exist: section 2241 remains available as a source of habeas jurisdiction; the scope of that jurisdiction is not limited so as to exclude petitioners' claims'; it is proper for a district court to entertain a section 2241 petition; and the petitioners are in custody for the purpose of habeas corpus.

**B. Eastern District of New York Is the Proper Forum: Personal Jurisdiction and Venue.**

■ The fact that subject matter jurisdiction exists does not end the inquiry. In a habeas corpus proceeding, the appropriate forum is governed by two factors: (1) whether the court has personal jurisdiction over the petitioner's custodians and (2) whether the petitioner satisfies traditional venue considerations. The two inquiries are distinct and must be addressed separately.

The government contests personal jurisdiction and venue as to petitioner Mojica; no such contentions are made in respect to petitioner Navas. As shown below, this court has personal jurisdiction over both petitioners' custodians and the Eastern District of New York is the most convenient and appropriate venue for both habeas actions. Because appropriate personal jurisdiction and venue with regard to Navas is beyond dispute, discussion here focuses on Mojica.

**(1) Court Has Personal Jurisdiction Over Petitioners' Custodians**

■ In a habeas proceeding, the court has personal jurisdiction "so long as the custodian can be reached by service of process." *Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 495, 93 S.Ct. 1123, 1130, 35 L.Ed.2d 443 (1973) (district court in Kentucky had personal jurisdiction over petition filed by Alabama inmate); *see also U.S. ex rel. Sero v. Preiser,* 506 F.2d 1115, 1128 (2d Cir.1974), *cert. denied,* 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975) (jurisdictional grant in section 2241(a) co-extensive with scope of service of process); *Yesil v. Reno,* 958 F.Supp. at 835–36 (S.D.N.Y.1997) (habeas action proper in S.D.N.Y. although petitioner was released on bond by Louisiana INS district director); *Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997) (government's Rule 59(e) motion pending).

■ Personal jurisdiction is fixed at the time that the habeas petition is filed. *See, e.g., Ledesma–Valdes v. Sava,* 604 F.Supp. 675, 679 (S.D.N.Y.1985). So long as the court had personal jurisdiction at the time that petitioner filed the action, surrender and physical detention in Oakdale in the midst of the proceedings did not affect this court's jurisdiction; this finding is conceded by the government.

■ The government asserts that even if the court has subject matter jurisdiction pursuant to section 2241, it cannot entertain Mojica's petition because it lacks personal jurisdiction for habeas purposes since the only proper custodian-respondent to Mojica's

petition is the INS district director in New Orleans, Louisiana who is outside of the court's personal jurisdiction.

The government's contentions as to the proper custodian and the court's reach are incorrect. Here, there are several custodians, including the Louisiana District Director of the INS, the Attorney General, the Commissioner of the INS, and the New York District Director of the INS. The habeas statute does not "specify who the person having custody will be," nor does it state that there may be only one custodian. *Nwankwo v. Reno*, 828 F.Supp. 171, 174 (E.D.N.Y.1993) (citations and internal quotation marks omitted). "Nowhere does the statute speak of an immediate custodian. . . ." *Id.* All these custodians can be reached by service of process.

First, the District Director for the New Orleans district office of the INS, John B.Z. Caplinger, is a custodian over Mojica, as the government concedes. Because he can be reached by service of process, this court has personal jurisdiction. Rule 4(e)(1) of the Federal Rules of Civil Procedure allows service of process under the rules of the state in which the district court sits. The State of New York's service of process rules govern. *See Yesil v. Reno*, 958 F.Supp. 828, 835 (S.D.N.Y.1997); *Eltayeb v. Ingham*, 950 F.Supp. 95, 99 (S.D.N.Y.1997); *Nwankwo v. Reno*, 828 F.Supp. 171, 175 (E.D.N.Y.1993) (analyzing former Rule 4(c)(2)(C)(i) and (e) now replaced by new Rule 4(e).

■ Under New York state law, process may be served on a non-domiciliary who "transacts *any* business within the state" even if the defendant never enters New York, so long as the defendant's activities here were purposeful and the transaction is related to the claim asserted. N.Y. C.P.L.R. § 302(a)(1) (emphasis added). *See, e.g., PDK Labs v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997); *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 522 N.E.2d 40, 527 N.Y.S.2d 195 (1988).

Mojica's only connection to Oakdale, Louisiana has been his detention there by the INS and Caplinger. After Mojica's initial detention in Oakdale, he was released on bond, but only after a telephonic bond redetermination hearing during which he was represented by his present attorneys in New York. When his bond was posted, Caplinger knew Mojica was coming back to his home in Corona, New York. By allowing Mojica to return to New York, but continuing to claim the power to control his actions, to seek his surrender, and to deport him, respondent Caplinger has "transact[ed] . . . business within the state." N.Y. C.P.L.R. § 302(a)(1).

Caplinger's recent order to Mojica to return to Louisiana from New York was implemented and enforced by the government's New York-based attorneys. In enforcing the unlawful deportation order against Mojica and by seeking his surrender to Oakdale pending resolution of this matter, respondent Caplinger "purposefully thrust himself into the [Eastern] District of New York," *Yesil v. Reno*, 958 F.Supp. 828, 835 (S.D.N.Y.1997), and has taken coercive enforcement action against a long-time resident of New York. *See Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 17, 18, 256 N.E.2d 506, 508–09, 308 N.Y.S.2d 337, 340–41 (N.Y.1970). Respondent Caplinger thus not only transacted business in New York, but did so in this very court, and with regard to the very claim Mojica brings before this court, namely the legality of his deportation order. He is thus amenable to service under CPLR 302(a)(1), and the court has personal jurisdiction over him.

■ The Attorney General of the United States is also a custodian for habeas purposes and can be reached by service under New York law. *See Nwankwo v. Reno*, 828 F.Supp. 171, 175–76 (E.D.N.Y.1993). In *Nwankwo*, the petitioner was convicted in the Eastern District of New York and, upon completion of his sentence, was taken into INS custody and transferred to Oakdale for deportation proceedings. He subsequently filed a habeas petition in the Eastern District of New York. The *Nwankwo* court held that the personal jurisdiction requirement was satisfied. It found that the Attorney General was an appropriate custodian because she could "direct her subordinates to carry out any order directed to her to produce or release the petitioner." *Nwankwo*, 828

F.Supp. at 174 (citations and internal quotation marks omitted).

*Billiteri v. United States Board of Parole,* 541 F.2d 938 (2d Cir.1976), on which the government relies, can be distinguished from the instant case as it was in *Nwankwo.* *Billiteri* held that the Parole Board is not the prisoner's custodian when the prisoner has not been released on parole and is still in physical detention. *Billiteri* is inapplicable because the warden of a prison is not a delegate or agent of the Parole Board, whereas a District Director of the INS acts only pursuant to powers delegated by the Attorney General.

The Attorney General is here an appropriate respondent. "Because the Attorney General, in her official capacity, clearly transacts business in New York," she can be reached by service of process. *Nwankwo v. Reno,* 828 F.Supp. 171, 175 (E.D.N.Y.1993). *See* N.Y.C.P.L.R. § 301 (service reaches non-domiciliary who regularly transacts business in New York State, even if the cause of action has no connection to the state). *See also Welinsky v. Resort of the World,* 839 F.2d 928 (2d Cir.1988); *cf. Strait v. Laird,* 406 U.S. 341, 346, 92 S.Ct. 1693, 1696, 32 L.Ed.2d 141 (1972) (California court has habeas jurisdiction over petition filed by an army reservist residing in California although reservist's custodian—commanding officer—was located in Indiana; commanding officer's contacts with California through the chain of command were enough to give the officer "presence" within California for habeas purposes).

■ It is important to note that were the government correct that a habeas petition may be heard only where the petitioner is detained, then the Attorney General "could seriously undermine the remedy of habeas corpus by detaining illegally a large group of persons in one facility so that the 'resulting torrent of habeas corpus petitions' would overwhelm" the local court. *Nwankwo v. Reno,* 828 F.Supp. 171, 175 (E.D.N.Y.1993); *see also Strait v. Laird,* 406 U.S. 341, 345, 92 S.Ct. 1693, 1696, 32 L.Ed.2d 141 (1972) (requiring habeas petitions to be filed in only one in district would "ignore reality" and result in inefficient concentration of cases). *But see Wang v. Reno,* 862 F.Supp. 801, 813 (E.D.N.Y.1994) (distinguishing *Nwankwo* because no backlog would delay *Wang* petition as in *Nwankwo* ).

The laws of the state of New York allow for service of process over all of Mojica's custodians, including Caplinger. Mojica is a longstanding resident of New York with substantial ties to this state. Among other things, both his family and attorneys reside and transact business here. Moreover, Caplinger permitted Mojica to return to New York, yet retained the right to control his liberty while Mojica was residing in New York. The personal jurisdiction requirement is satisfied. The Attorney General may not frustrate the courts and negate the Great Writ by moving prisoners around the country.

**(2) Venue Is Proper with Regard to Petitioners**

■ Venue with regard to Mojica is proper in the Eastern District, and *a fortiori* with respect to Navas. While the habeas corpus statute does not contain a venue provision applicable to this case—the habeas statute's explicit venue provision, subsection 2241(d), pertains only to "a person in custody under the judgment and sentence of a State court"—the Supreme Court has made clear that courts should apply "traditional venue considerations" in a habeas proceeding where venue is not fixed by statute. *See Braden v. 30th Judicial Circuit Court of Kentucky,* 410 U.S. 484, 493, 93 S.Ct. 1123, 1128–29, 35 L.Ed.2d 443 (1973); *see also U.S. ex rel. Sero v. Preiser,* 506 F.2d 1115, 1130 & n. 11 (2d Cir.1974) (appropriateness of habeas venue in New York "bolstered" by analogy to section 1391(e) which looks to residence of plaintiff); *Nwankwo v. Reno,* 828 F.Supp. 171, 176 & n. 2 (E.D.N.Y.1993).

■ Such traditional venue considerations include, but are not necessarily limited to: (1) the location where the material events took place, (2) where records and witnesses pertinent to the claim are likely to be found, (3) the convenience of the forum for respondent and petitioner, and (4) the familiarity of the court with the applicable laws. *See Braden v. 30th Judicial Circuit Court of Ken-*

*tucky,* 410 U.S. 484, 493–94, 93 S.Ct. 1123, 1128–29, 35 L.Ed.2d 443 (1973).

In the instant case, these considerations strongly militate in favor of adjudicating Mojica's habeas petition in the Eastern District of New York. Until his transfer from the INS's Varick Street detention center in New York, Mojica had never been in Louisiana. The crime for which he became deportable took place in the Eastern District of New York. Witnesses and evidence necessary to establish his eligibility for 212(c) relief are all located in New York.

Mojica would be severely disadvantaged by having to bring a habeas proceeding in Louisiana since his attorneys are located in New York and have expended extensive efforts on this matter in the Eastern District. *See Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y. 1997). The choice of forum could significantly affect Mojica's rights because the law varies from circuit to circuit, and as a resident of the Second Circuit for over twenty years, Mojica should have his case decided under Second Circuit law. *Id.* There is also a possibility of a backlog habeas petitions in Louisiana, which could result in Mojica's right to habeas review being significantly delayed while he remained in detention in Louisiana, without realistic access to his attorneys or family. *See Nwankwo v. Reno,* 828 F.Supp. 171, 174 (E.D.N.Y.1993) ("common sense administration of justice" meant court should hear case given large volume of habeas petitions in Western District of Louisiana).

In contrast, the government and respondent Caplinger are not prejudiced if they are required to litigate in this court. As the *Yesil* court noted, the INS traditionally has been well represented in this district and can litigate here as well as in Louisiana. *Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y.1997). That is not true for Mojica, who likely would be required to retain new counsel in Louisiana, since his counsel has no office in Louisiana and could not practicably provide adequate representation if the case were transferred.

Additionally, this court has an interest in adjudicating petitioner's case. Respondent Caplinger has caused the surrender for deportation of a resident of the State of New York who has resided for the last twenty-three years in the Eastern District of New York and has never had any previous contact with Louisiana. *See Yesil v. Reno,* 958 F.Supp. 828, 836 (S.D.N.Y.1997) (adjudicating habeas petition of alien released on bond from Oakdale INS facility and living in New York at time of habeas petition).

Because there is subject matter jurisdiction pursuant to section 2241 of Title 28, personal jurisdiction over the custodians, and the Eastern District of New York is the proper venue, the court has the power to address petitioners' claims. That substantive issue is dealt with below.

## V. Protection of Legal Permanent Residents Against Arbitrary Deportation

### A. Statutory History of Section 212(c) and Section 440(d)

The history of relevant provisions of law allowing for hearings before deportation for reasons of compassion and justice are set out in Part II.A., *supra.* They need not be repeated here.

### B. Section 440(d) Does Not Retroactively Eliminate Right of Petitioners to a Fairness Hearing

▪ *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), delineated the approach that courts must take in determining the temporal effect of new legislation. First, courts review the statutory provision to determine whether there are any constitutional bars to retroactive implementation. Second, they ascertain whether the statute itself manifests express congressional design favoring retroactivity. Finally, where courts can divine no explicit constitutional prohibition or congressional design, they must determine the time that the legislation comes into effect, keeping in mind that the default rule underlying all judicial interpretation of statutes is against retroactive application. With section 440(d) of the AEDPA, Congress expressed no clear intent favoring retroactivity and there may be constitutional barriers to retroactivity. This analysis leads to a conclusion against

retroactivity; the government cannot prevent petitioners from applying for section 212(c) discretionary relief and having their petitions determined on the merits.

### (1) Constitutional Barriers to Retroactivity

■ The Constitution is infused with the common-law aversion to retroactivity:

It is ... not surprising that the antiretroactivity principle finds expression in several provisions of our Constitution. The Ex Post Facto Clause flatly prohibits retroactive application of penal legislation. Article I, § 10, cl. 1 prohibits States from passing another type of retroactive legislation, laws "impairing the Obligation of Contracts." The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a "public use" and upon payment of "just compensation." The prohibitions on "Bills of Attainder" in Art. §§ 9–10 prohibit legislation from singling out disfavored persons and meeting out summary punishment for past conduct ... The Due Process Clause also protects the interest in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a state's prospective application under the Clause "may not suffice" to warrant its retroactive application."

*Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (citations and footnotes omitted). Of all the constitutional arguments that might be made against retroactive application of the AEDPA, the due process argument is, in the present instance, the strongest.

■ The heart of the due process requirement for retroactive legislation is "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown University Hospital,* 488 U.S. 204, 223, 109 S.Ct. 468, 479, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring). Like any aspect of legislation, retroactive characteristics must meet the basic due process requirement of being "supported by a legitimate legislative purpose furthered by a rational means." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984). With retroactive legislation, there must be an independent rationale for retroactivity. *See id.,* 467 U.S. at 730, 104 S.Ct. at 2718. A purpose that supports a law's prospective characteristics is not sufficient, in itself, to support retroactively. *See id.*

In the present case, Congress offered no purpose for retroactivity. The statute, read as a whole, does not even provide for retroactivity. The Attorney General's opinion in *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb.. 21, 1997), offers no explanation for a retroactive rule. Instead her opinion merely defends retroactivity as permissible. Even in the most deferential areas of rational basis review, such an absence of purpose is a significant factor that can lead a court to strike down a government program as lacking a rational basis. Compare *Allegheny Pittsburgh Coal Co. v. Webster County,* 488 U.S. 336, 343–44, 109 S.Ct. 633, 637–38, 102 L.Ed.2d 688 (1989) (striking down differential real-estate tax scheme where there was no clear state policy) with *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (upholding differential real-estate tax scheme where it furthered California's interest in protecting home-owners from escalating real-estate values).

Cases where the Supreme Court has upheld retroactive statutes against due process challenges are characterized by circumstances not applicable here. First, they involved challenges to statutes where congressional policy on retroactive application is unambiguous. For example, *Usery v. Turner Elkhorn,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), concerned an attack on a congressional program for allocating the costs of Black Lung injuries sustained by workers on the job. Congress had to balance the issue of retroactivity with the problem of developing an equitable plan that avoided unfair burdens on current producers and recognized that past employers had benefitted from the activity that was the cause of the harms Congress sought to

ameliorate. *See also United States v. Sperry*, 493 U.S. 52, 64–65, 110 S.Ct. 387, 396–97, 107 L.Ed.2d 290 (1989) (upholding method for allocating costs of Iran–United States Claims Tribunal as preventing windfalls and equitably distributing costs). In other cases, the Court noted that retroactivity was necessary to address the problem of actors modifying their behavior for inappropriate economic gain during the pendency of legislation. *See, e.g., Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730–31, 104 S.Ct. 2709, 2718–19, 81 L.Ed.2d 601 (1984) (retroactivity of provisions on withdrawal from pension plans designed to check against employers withdrawing from plans during the lengthy legislative process). In still others, retroactivity was designed to correct inequities that resulted from unexpected judicial interpretations of prior law (*see General Motors Corp. v. Romein*, 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992)) or were targeted to correct an unexpected loophole created by prior law. *See United States v. Carlton*, 512 U.S. 26, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (permitting one year retroactivity for statute correcting a mistake in prior law).

The Supreme Court's recognition of the need to evaluate separately the rationality of retroactivity post-dates older cases upholding retroactive deportation laws. Even those older deportation cases identified a congressional purpose in the retroactivity itself For example, in *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) and *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), the Court identified congressional security interests in the deportation of past and current members of the Communist Party. As the Court explained in *Harisiades,* the Communist Party's action to "drop aliens from membership, at least in form, in order to immunize them from the consequences of their party membership" made the distinction between past and present membership meaningless and required a statute that looked to past membership. *Harisiades v. Shaughnessy*, 342 U.S. 580, 593, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). The statute considered in *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955), and *Lehmann v. United States*, 353 U.S. 685, 77 S.Ct. 1022, 1 L.Ed.2d 1122 (1957), was also plainly intended to be retroactive. *See Lehmann*, 353 U.S. at 689–90, 77 S.Ct. at 1024–25. The Court's decisions, however, did not take up the question whether this clearly stated congressional policy satisfied due process requirements. Its decisions referred only to Ex Post Facto objections.

In the instant situation courts are left to guess at what purpose could be served by applying section 440(d) retroactively. Without any guidance from Congress, the court may be tempted to analogize to discover possible purposes supporting retroactivity. Such an exercise in hypotheticals is not generally permissible. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984) (requiring an independent rationale for retroactive application). In any event, the prospective scheme created by the AEDPA bears little rational relationship to the way that the law would work if it were applied retroactively.

First, as applied prospectively, the AEDPA serves to provide notice of the severe and certain deportation consequences that will flow from commission of any of the crimes enumerated in section 440(d). It may therefore be seen as making clear the very high standards to which immigrants will be held. It may well have a deterrent effect. By contrast, when applied retroactively to crimes that were treated leniently in the criminal justice system, the statute works only to upset and frustrate expectations. *Cf.* Jill E. Fisch, Retroactivity and Legal Change: An Equilibrium Approach, 110 Harv. L. Rev. 1056, 1118 (1997) ("To the extent legislation disrupts a stable equilibrium, it should normally be prospective in application.").

Retroactive application would create a situation in which people who have lived in the community, have established themselves as valuable members of society, and who are needed to support their families, are summarily deported without regard to the present and future interests of their families or the community at large. *Cf.* Barry R. Chiswick, The Performance of Immigrants in the United States Labor Market 95, 110 in Economic Aspects of International Migration (Herbert Giersch ed.1994) (discussing the "high[ ] level of ability and motivation"

among immigrant workers). Moreover, under the AEDPA's vast expansion of the relevant crimes leading to automatic deportation, these consequences would be visited on people who committed crimes that may have been treated leniently in the criminal justice system.

The arbitrariness of retroactive application is illustrated by the case of Mojica. Although he was deportable, the INS showed no interest in commencing deportation proceedings. To the contrary, it demonstrated a studied indifference to his presence, electing on numerous occasions not to institute proceedings. And it did so despite the fact that Mojica was incarcerated and that it had a clear opportunity to place him under detainer. Arguably the INS had made a judgment that Mojica was a likely candidate for waiver of deportation under the existing law. Meanwhile, Mojica reestablished his life with his citizen wife and citizen children, proceeded with his business, and created a record that arguably demonstrated that he is a valuable member of our society for whom there should at least be some consideration of equities prior to deportation. Congress has certainly not offered a rationale for subjecting him to summary deportation. Cruelty to the family which has reestablished a relationship with someone who has been incarcerated and now is torn once again from the bosom of the family for the crime he or she paid for many years ago does not seem to have been part of congressional design.

Retroactivity generally targets those whom the INS had once decided *not* to detain and place in deportation proceedings. It denies them the relief that was available to their fellow inmates who had deportation proceedings against them commenced in a timely manner. For legal permanent residents such as petitioner Mojica, deportation proceedings do not follow criminal incarceration. Instead, they are triggered by unwitting contacts with the INS following a trip abroad, an application for citizenship, or an application for a replacement permanent resident card. When deportation proceedings actually begin depends on when these events occur, and on whether the INS then institutes proceedings. By choosing not to pursue deportation for legal residents such as Mojica, the INS demonstrated a belief that such individuals need not be deported. The irony is that those whom the INS deemed strong candidates for deportation had the opportunity to seek section 212(c) relief from deportation, and, as discussed further below, had a good chance at prevailing. In contrast, persons deemed excellent candidates for section 212(c) relief because of strong family ties, value to their communities, and manifest rehabilitation are now told that they are to be automatically deported without any opportunity of section 212(c) individual merit-based review. Not only does such an interpretation lack any legislative support for the required distinct rationale (*Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 730, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984)), such an absurd proposition flies in the face of what appears to be Congress's design in enacting the AEDPA——facilitating the quick removal of criminal aliens who pose a threat to society while continuing to provide avenues of individual merit-based review for long term legal residents who have been rehabilitated and who are vital members of American families and American communities.

The irrationality of the Attorney General's construction of the statute is further evidenced by the fact that the BIA is required under this interpretation to order the deportation of aliens in proceedings where the Immigration Judges have already weighed the evidence in the case and have concluded that it is in the interests of the United States for the immigrant to remain. These are cases where a person has shown true rehabilitation; where there are dependent family members; and where a person with a prior addiction who committed a drug-related crime has overcome the addiction and led a crime-free and upstanding life.

In sum, not only has Congress failed to articulate any rational purpose, but after a year of the government's attempts at retroactive application, it still can identify no rational purpose for the retroactive application of section 440(d).

### (2) Manifest Congressional Design

 Without manifest congressional design expressed in clear statutory language, the default rule in statutory interpretation requires prospective implementation. *See Landgraf v. USI Film Products*, 511 U.S. 244, 272, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994); *See also Jeffries v. Wood*, 114 F.3d 1484, 1494 (9th Cir.1997) (discussing judicial statutory interpretation post-*Landgraf*). With respect to section 440(d) of the AEDPA, as with the legislation reviewed in *Landgraf*, "[t]he absence of ... language [on retroactivity] cannot realistically be attributed to oversight or to unawareness of the retroactivity issue." *Landgraf*, 511 U.S. at 256, 114 S.Ct. at 1492. "In statutory construction, [courts] presume Congress legislated with an awareness of relevant judicial decisions." *Jeffries*, 114 F.3d 1484, 1495. As with the legislation in *Landgraf*, "[i]t is entirely possible—indeed, highly probable— that ... Congress viewed the matter as an ... issue to be resolved by the courts. *Landgraf*, 511 U.S. at 256, 114 S.Ct. at 1492.

Where it agrees upon and purposely enacts provisions explicitly meant to have retroactive effect, Congress has no trouble finding the words to do so. The following is a listing of the AEDPA Title IV immigration provisions which Congress elected to apply to pre–Act conduct or events:·

Section 401(f)—"The amendments made by this section shall take effect on the date of enactment of this Act and *shall apply to all aliens without regard to the date of entry or attempted entry into the United States.*" (emphasis supplied). Here, Congress determined that the relief-restricting and rights-limiting provisions of section 401 (enacting new alien terrorist removal procedures) applied to any alien even if the alleged terrorist conduct pre-dated AEDPA.

Section 413(g)—"The amendments made by this section shall take effect on the date of the enactment of this Act and *shall apply to applications filed before, on, or after such date if final action has not been taken on them before such date.*" (emphasis supplied). Here, Congress determined that the relief-restricting provisions of section 413 (denying various forms of relief to alien terrorists) applied to an alien even if the alleged terrorist conduct pre-dated AEDPA as long as no final action had been taken on the application for relief prior to AEDPA's enactment.

Section 421(b)—"The amendment made by subsection (a) shall take effect on the date of the enactment of this Act and *apply to asylum determinations made on or after such date.*" (emphasis supplied). Here, Congress determined that the relief-restricting provision of section 421(a) (denying asylum relief to alien terrorists) applied to an alien even if the alleged terrorist conduct pre-dated AEDPA as long as no asylum determination had been made prior to AEDPA's enactment.

Section 435(b)—"The amendment made by subsection (a) *shall apply to aliens against whom deportation proceedings are initiated after the date of the enactment of this Act.*" (emphasis supplied). Here, Congress determined that the deportability-expanding provision in section 435(a) (expanding the types of offenses that make an alien deportable under category of crimes of moral turpitude) applied to an alien even if the alleged criminal conduct and conviction pre-dated AEDPA as long as the individual was not placed in deportation proceedings before AEDPA's enactment.

Section 440(f)—"The amendments made by subsection (e) *shall apply to convictions entered on or after the date of the enactment of this Act, except that the amendment made by subsection (e)(3) shall take effect as if included in the enactment of section 222 of the Immigration and Nationality Technical Corrections Act of 1994.*" (emphasis supplied). Here, Congress determined that the deportability-expanding and relief-limiting provisions of section 440(e) (expanding ·the types of offenses that bring an alien's conviction within the definition of an aggravated felony and that therefore expand deportability and at the same time limit eligibility for relief) applied in the case of an alien even if the alleged criminal conduct pre-dated AEDPA as long as the individual was not convicted before AEDPA's enactment, and,

applied in the case of an alien covered by subsection (e)(3) (relating to conviction for alien smuggling) even if the conviction pre-dated AEDPA.

Section 441(b)—"The amendment made by subsection (a) *shall apply to criminal proceedings initiated after the date of enactment of this Act.*" (emphasis supplied). Here, Congress determined that the criminal defense-limiting provisions of section 441(a) (limiting attacks on an underlying deportation order in a criminal prosecution for illegal reentry after deportation) applied in the case of an alien even if the underlying criminal conduct pre-dated AEDPA as along as the individual was not placed in criminal proceedings before AEDPA's enactment. It should be noted that section 441(a) is a criminal provision whose applicability in individual criminal prosecutions is ultimately governed by the Ex Post Facto doctrine; however, even with respect to the applicability of an amendment when Congress knew that it would not have the last word, Congress included express language calling for application of the amendment in some cases based on pre-Act conduct where Congress wished for such retroactive application.

These provisions (whose constitutionality is not now being challenged) show that where Congress chose to deviate from the principle of prospectivity, it singled out the specific situation where it wanted to change the legal consequences of pre-Act events and specified the degree of retroactivity. In contrast to these various formulations for retroactive application to pre-Act conduct, by implication Congress designated section 440(d) as a prospective provision since it included no language providing for its application to pre-Act conduct or events. In this sense, the situation with section 440(d) is no different than one described by the Supreme Court over twenty-five years ago: "Obviously ... when Congress wished to provide [for retroactive application], it knew how to do so expressly." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 571, 99 S.Ct. 2479, 2487, 61 L.Ed.2d 82 (1979).

### (3) Applying the Default Rule Against Retroactivity

### (a) Basic Application of *Landgraf*

Even if there were no constitutional barrier to retroactivity, section 440(d) must be read as having prospective effect only. To state that the law is prospective does not end the court's task in determining the application of the statute. The *Landgraf* court explained:

A statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment.... Rather, the court must ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event. Any test of retroactivity will likely leave room for disagreement in hard cases, and is unlikely to classify the enormous variety of legal changes with perfect philosophical clarity. However, retroactivity is a matter on which judges tend to have sound instincts ... and familiar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance.

*Landgraf v. USI Film Products,* 511 U.S. 244, 269–70, 114 S.Ct. 1483, 1499, 128 L.Ed.2d 229 (1994). (citations and internal quotation marks omitted).

The *Landgraf* Court's reasoning supporting the presumption against retroactivity sheds further light on how courts are to fulfill their role in resolving "disagreement in hard cases" of statutory interpretation:

The legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

*Landgraf v. USI Film Products,* 511 U.S. 244, 266, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994).

Courts determining the potential retroactive effect of new legislation must review the totality of the circumstances with a solid sense of traditional American notions of fairness and justice:

> Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.... In a free, dynamic society ... a rule of law that gives people confidence about the legal consequences of their actions is a fundamental engine driving the engine of society.

*Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) (citations and internal quotation marks omitted).

A court must have an eye toward the particularly harsh consequences for "unpopular groups or individuals" unlucky enough to be the targets of fleeting politically-motivated passionate outbursts. Special attention to reviled, outcast groups is needed in a variety of contexts. *See, e.g., United States v. Fuentes–Barahona,* 111 F.3d 651, 652 (9th Cir.1997) (on statutory Sentencing Guidelines). There are few groups of adults and children so routinely ostracized and so voiceless in our democracy as non-enfranchised, non-citizen immigrants even though they form a vibrant and integral part of American society. The cruelty of retroactivity is obvious.

■ The government's argument can be reduced to a syllogism: The *Landgraf* presumption only applies when there is retroactivity; deportation for past convictions (or perhaps for any past conduct) is never retroactive; therefore the *Landgraf* presumption is irrelevant to the reading of the AEDPA's scope. Whether deportation statutes can be removed from *Landgraf* analysis through this syllogism requires review of *Landgraf* and the constitutional and statutory interpretation doctrine in which it is rooted. *Landgraf* reaffirmed some 200 years of precedent

that recognizes that retroactive laws are presumptively unjust. *See Landgraf,* 511 U.S. 244, 270–71, 114 S.Ct. 1483, 1499–1500, 128 L.Ed.2d 229 (1994); *United States v. Heth,* 7 U.S. (3 Cranch) 399, 2 L.Ed. 479 (1806). The Court stated: "Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations." *Landgraf,* 511 U.S. at 272, 114 S.Ct. at 1500.

Although *Landgraf* is a case about statutory interpretation, it expressly refers to the Supreme Court's constitutional jurisprudence to inform its discussion of the statutory presumption against retroactivity and unfair retroactive effects. The Court had occasion to revisit this constitutional backdrop this term in *Lynce v. Mathis,* ── U.S. ──, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); *see also, Lindh v. Murphy,* ── U.S. ──, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (habeas corpus changes not applicable to pending cases); *see also, Skubel v. Fuoroli,* 113 F.3d 330, 334–38 (2d Cir.1997). Quoting *Landgraf,* the Court explained in *Lynce* that the presumption against retroactivity "is deeply rooted in our jurisprudence and embodies a legal doctrine centuries older than the Republic." *Lynce,* ── U.S. at ──, 117 S.Ct. at 895 (quoting *Landgraf,* 511 U.S. at 265, 114 S.Ct. at 1497). *Lynce* proceeded to explain that:

> in both the civil and the criminal contexts, the Constitution places limits on the sovereign's ability to use its law-making power to modify bargains it has made with its subjects. The basic principle is one that protects not just the rich and the powerful, but also the indigent defendant engaged in negotiations that may lead to an acknowledgment of guilt and a suitable punishment.

*Lynce,* ── U.S. at ──, 117 S.Ct. at 895 (emphasis added).

[39] The longstanding case law on what makes a criminal statute retroactive provides helpful analogies. Any change from a discretionary system to a system of mandatory penalties for prior crimes is retroactive. That is because the individual is being deprived of the ability to bring equitable circumstances to bear on his case. *See War-*

*den, Lewisburg Penitentiary v. Marrero,* 417 U.S. 653, 663, 94 S.Ct. 2532, 2538, 41 L.Ed.2d 383 (1974) (statute taking away parole eligibility for offenses subject to parole according to the law at the time they were committed could be found to be constitutionally impermissible as an ex post facto law); *Lindsey v. Washington,* 301 U.S. 397, 57 S.Ct. 797, 81 L.Ed. 1182 (1937) (a statute changing a maximum sentence to a mandatory sentence for an offense committed prior to statute's enactment is an impermissible ex post facto law). Retroactivity depends on when the crime is committed, and not on any later date. In a system of law people have a right to know the possible consequences of their actions and to know that these consequences will not lightly be changed.

Even if retroactivity is measured from conviction rather than from commission of the crime it is suspect. Once the individual is accused of a crime and has to make choices during criminal proceedings, he or she begins actual reliance on expectations of the law. In criminal proceedings the accused faces a number of choices. The defendant may (1) plead guilty as charged (or, in some jurisdictions, *nolo contendere* ); (2) plead guilty to a lesser offense in exchange for dropping of a more serious charge; or (3) contest the charge and go to trial. If convicted the defendant may choose to appeal or waive appeal. In particular a defendant who plea bargains must choose among various possible dispositions, weighing various possible sentencing outcomes and other consequences. Those consequences include whether the plea will lead to deportation.

These choices are faced by the innocent as well as the guilty. Though innocent, an individual accused of a crime may choose to plead guilty to a lesser charge in order to get out of jail (with a sentence of "time served" only) after a high bail has been set or, even if out on bail, in order to avoid any jail time. This is particularly true with respect to individuals in certain racial, ethnic, or other categories who are more likely to be treated harshly at each stage of the criminal process, including arrest, charging, setting of bail, plea bargaining, and sentencing. *See generally* "Race and Criminal Justice" in The Real

War on Crime: The Report of the National Criminal Justice Commission, ch. 4 (Steven R. Donziger, ed.1996). The court can take judicial notice, based on experience in the Eastern District of New York, that noncitizens are more likely to be harshly treated by the criminal justice system, particularly, as in the instant case, if they are Latinos accused of drug-related crimes.

Those facing a higher risk of detention before trial because they can not meet bail requirements have a greater incentive to accept a plea that will allow them to avoid a prison sentence. Even if prison time cannot be avoided, the defendant may plead to a lesser charge in order to avoid the risk of a finding of guilt and a stiffer sentence based on a more serious charge. Among the reasons an individual might agree to a plea to avoid any jail time, or more jail time, is simply to be able to retain employment and the ability to care for his or her family on a day-to-day basis.

Of the non-citizens convicted in United States district courts during 1994, 92.3 percent entered guilty pleas. J. Scalia, Noncitizens in the Federal Criminal Justice System, 1984–94, U.S. Department of Justice, Bureau of Justice Statistics Special Report (Aug.1996). For a non-citizen, the choice to forego trial and plead guilty is often critically dependent on information regarding possible immigration consequences. *See United States v. Del Rosario,* 902 F.2d 55, 61 (D.C.Cir.1990)(Mikva, J., concurring), *cert. denied,* 498 U.S. 942, 111 S.Ct. 352, 112 L.Ed.2d 316 (1990) ("The possibility of being deported can be——and frequently is——the most important factor in a criminal defendant's decision how to plead"); *Williams v. State,* 641 N.E.2d 44 (Ind.1994) ("The possibility of deportation ... is a consequence which undoubtedly would enter into the decision-making process of a defendant considering a plea bargain"); *People v. Pozo,* 746 P.2d 523, 529 (Colo.1987) ("In cases involving alien criminal defendants, for example, thorough knowledge of fundamental principles of deportation law may have significant impact on a client's decisions concerning plea negotiations and defense strategies"); *see also Costello v. INS,* 376 U.S. 120, 130–31, 84 S.Ct.

580, 586, 11 L.Ed.2d 559 (1964) (noting that if immigrant had been aware that he faced deportation, he could have offered to plead to charges that would not have made him deportable).

The importance of immigration consequences can be seen in the following hypothetical example of the effects of the new law were it given retroactive effect.

Mr. A, a lawful permanent resident of many years residence in the United States was arrested several years ago after he was found in a car in which the police found marijuana. He denied that the marijuana found was his. Nevertheless, he was charged with the New York State crime of criminal possession of marijuana in the third degree. (New York Penal Law Section 221.20) (unlawfully possesses more than eight ounces of preparations, compounds, mixtures or substances containing marijuana). Mr. A had a job and family to support. He also did not want his family or employer to know of his arrest. He therefore desperately wished to avoid a prison sentence. Thus, in order to avoid the possibility of a prison sentence if he took the case to trial and was nevertheless found guilty, he chose on advice of his defense counsel to plead to the misdemeanor offense of possession of marijuana in the fourth degree (New York Penal Law Section 221.15) (possesses more than two ounces) even though he continued to deny knowledge of the marijuana. He chose to do so based on an understanding that he would be sentenced only to probation for the misdemeanor charge. His choice was also based on his understanding that, even though the conviction for the misdemeanor charge would make him deportable, were INS to bring deportation proceedings against him he would have the right to apply to an Immigration Judge for a waiver of deportation based on numerous equities in his case. Mr. A also waived appeal. He has no further arrests and continues to work and support his wife and United States citizen children.

Recently, years later, Mr. A applied for citizenship. Instead of granting him citizenship, the naturalization examiner learns of his past conviction and initiates deportation proceedings against him. If section 440(d) is applied to Mr. A, he will be subject to automatic deportation despite the fact that he was convicted years ago and despite the fact that before April 24, 1996, he had a statutory right to apply for a waiver of deportation. He would be automatically ordered deported because his minor drug conviction renders him deportable under INA Section 241(a)(2)(B)(i), one of the grounds for which one cannot obtain a waiver under AEDPA section 440(d).

If Mr. A had known that he would later be retroactively subject to a law making him mandatorily deportable if convicted of this New York State misdemeanor of criminal possession of marijuana in the fourth degree (possesses more than two ounces), he could have agreed to plead guilty only to criminal possession of marijuana in the fifth degree (possesses more than 25 grams of marijuana) or the violation of unlawful possession of marijuana. Ironically, he then would probably have avoided not only mandatory deportation, but deportability altogether. This is because Congress has made an exception to deportability for a conviction for one offense involving possession of 30 grams or less of marijuana. *See* pre-IIRIRA INA Section 241(a)(2)(B)(i).

The importance of immigration consequences of pleas in criminal cases cannot be underestimated. Deportation to a country where a legal permanent resident of the United States has not lived since childhood; or where the immigrant has no family or means of support; or where he or she would be permanently separated from a spouse, children and other loved ones, is surely a consequence of serious proportions that any immigrant would want to consider in entering a plea. As Justice Black wrote: "To banish [an immigrant] from home, family and adopted country is punishment of the most drastic kind." *Lehmann v. United States,* 353 U.S. 685, 691, 77 S.Ct. 1022, 1025, 1 L.Ed.2d 1122 (1957) (Black, J., concurring); *see also Lok v. INS,* 548 F.2d 37, 39 (2d Cir.1977) ("[d]eportation is a sanction which in severity surpasses all but the most Draco-

nian criminal penalties"). An immigrant can be expected to weigh the likelihood of this drastic punishment just as he or she would weigh other matters in a plea—such as the likely sentence, the availability of parole, and the overall disruption the plea will cause to his life.

Recognizing this central role of deportation consequences, the courts have, to varying extents, imposed on criminal defense counsel a duty to advise clients properly of the immigration consequences of pleading guilty. *See e.g., Michel v. United States,* 507 F.2d 461, 465–466 (2nd Cir.1974) (recognized defense counsel's obligation to advise about the "indirect consequences the guilty plea may trigger," including deportation); *Williams v. State,* 641 N.E.2d 44 (Ind.1994) ("attorney's duties to a client are [not] limited by a bright line between the direct consequences of a guilty plea and those consequences considered collateral"); *People v. Soriano,* 194 Cal.App.3d 1470, 240 Cal.Rptr. 328 (1987) (citing ABA standards as evidence of defense counsel's obligation to advise clients fully about collateral consequences of their guilty pleas); *People v. Pozo,* 746 P.2d 523 (Colo.1987) ("attorneys must inform themselves of material legal principles that may significantly impact the particular circumstances of their clients"); *People v. Correa,* 108 Ill.2d 541, 92 Ill.Dec. 496, 485 N.E.2d 307 (1985).

In several states, the criminal courts are required by statute to warn defendants of possible immigration consequences as a condition of accepting a guilty plea. Currently, at least thirteen states require deportation advisories as part of the criminal court's plea allocution. *See, e.g.,* California, Cal.Penal Code § 1016.5; Connecticut, Conn. Gen.Stat. Ann. § 54–1j; Massachusetts, Mass. Gen. Laws Ann. ch. 278, § 29D; New York, N.Y.Crim. Proc. Law § 220.50(7); Ohio, Ohio Rev.Code Ann. § 2943.031; Oregon, Or.Rev. Stat. § 135.385; Texas, Tex.Code Crim. Proc. Ann., art. 26.13; and Washington, Wash. Rev.Code Ann. § 10.40.200.

Bar and defender associations and organizations counsel criminal defense lawyers to advise their non-citizen clients of immigration consequences of criminal convictions. The National Legal Aid and Defender Association has recognized the duty of defense counsel in the plea bargaining process to "be fully aware of, and make sure the client is fully aware of ... consequences of conviction such as deportation." See NLADA Performance Guidelines for Criminal Defense Representation (1994), Guideline 6.2(a)(3) and commentary ("Deportation ... can be a devastating effect of conviction for non-citizens"); *See also* NLADA Performance Guideline 6.3(a) and commentary (requiring that defense counsel explain "the potential consequences of the agreement" and noting that collateral consequences, such as deportation, can "be greater than direct ones"). The American Bar Association has also counseled that defense lawyers advise their criminally accused clients of immigration consequences. ABA Standards for Criminal Justice, Pleas of Guilty, Std. 14–3.2 (2d ed.1982), commentary at 75 (where it is apparent that a defendant faces deportation as a result of a conviction or the defendant asks a question regarding these possible consequences, counsel "should fully advise the defendant of these consequences").

The duty to advise non-citizen clients of immigration consequences is reflected in the training and daily practice of criminal defense lawyers and organizations. For example, The Legal Aid Society routinely instructs its attorneys to inquire as to the citizenship status of their clients and to advise their non-citizen clients of immigration consequences. In fact, the Legal Aid Society has on staff a lawyer whose sole responsibility is to provide assistance and advice to the organization's legal staff and clients on immigration consequences of criminal proceedings and adjudications. The Society also includes training on immigration consequences in its instruction for new lawyers and provides regular updates and special training to its lawyer staff.

In sum, courts, state legislatures, and criminal defense lawyers consider it a duty of defense lawyers (or in some cases the criminal courts themselves) to give proper advice to a criminally accused non-citizen of immigration consequences of the disposition of the criminal case. Given this recognition of the

importance of immigration consequences, surely an unauthorized interpretation of the immigration laws affecting the calculus of risks and relevant rights must be seen as attaching a new and unfair legal consequence to the choices reasonably made by an affected individual relying on the then law.

The government argues that the long existing statutory right of a legal permanent resident to seek relief from deportation is "purely discretionary," and argues that eliminating the statutory right to seek the relief can be characterized as merely altering jurisdiction or the availability of future prospective relief. *See Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997).

The mere label of relief as discretionary is irrelevant to retroactivity analysis. It is well-established, for example, that changing a maximum sentence to a mandatory sentence has retroactive effect, even though the court always had the discretion to impose the maximum. *Lindsey v. Washington,* 301 U.S. 397, 400–02, 57 S.Ct. 797, 798–99, 81 L.Ed. 1182 (1937). Similarly, changing the possibility of deportation to automatic deportation alters radically the consequences that immigrants face. As explained above, the law prior to the AEDPA allowed and in some cases required criminal defense attorneys to advise legal permanent residents entering guilty pleas that they faced some risk of deportation, but that many circumstances, such as demonstrating true rehabilitation, the need to care for their families, and otherwise showing themselves to be productive members of society, would give them a reasonable chance of remaining. A lawyer could tell a client that at least half of section 212(c) applications have been granted. During fiscal years 1989 through 1994, over half of the total number of applications for section 212(c) relief decided by the Executive Office for Immigration Review (comprised of Immigration Judges and the BIA) were granted. *See* U.S. Department of Justice Executive Office for Immigration Review Statistical Sheet 1, Jan. 19, 1995, attached to Petitioners' Memorandum of Law, Ex. CC. The grant rate was undoubtedly even higher for the population that is now taking the brunt of the retroac-

tive application of the AEDPA section 440(d)—legal permanent residents who committed crimes—some minor—many years ago.

If the person's crime was relatively minor, and if his or her equities were great, the established practice of the BIA would suggest a likelihood of there being no deportation consequences to a conviction. The language of a 1970 BIA decision explaining the exercise of discretion in this area has become text book "law" upon which practitioners rely in advising clients, as indicated in the following quotation from a standard reference work:

> Where adverse factors are present in a given application it may be necessary for the applicant to offset these by a showing of unusual or even outstanding equities. Generally favorable factors such as family ties, hardship, length of residence in the United States, etc., will be considered as countervailing factors meriting favorable exercise of administrative discretion. In the absence of adverse factors, adjustment will ordinarily be granted....

National Lawyers Guild, Immigration Law and Defense, § 8.3(d) (quoting *Matter of Arai,* 13, Int. Dec. 494, 498 (B.I.A.1970)). Thus the client knew that his or her own conduct, like the good-time credits considered in *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 963–64, 67 L.Ed.2d 17 (1981), would play a central role in determining whether the client would ultimately face deportation. Certainly, no lawyer could promise a client that he or she would be granted 212(c) relief. Nevertheless, the right to apply for the waiver has been a statutory right which has played a central role in decisions made by criminally accused lawful permanent residents and other actors in the criminal justice system for decades.

The Attorney General dismissed this argument saying that no such advice could reasonably be given because "[for] the past forty years, the law has been settled that Congress may legislate to alter the immigration consequences of past criminal convictions or acts." *Matter of Soriano,* Int. Dec.3289, 1996 WL 426888 (beginning at screen page 1, BIA June 27, 1996) (beginning

at screen page 37, AG Op. Feb. 21, 1997). This argument begs the question. Whenever a court is faced with a *Landgraf* issue the question is whether Congress has acted clearly to upset expectations, and the issue is therefore always one of expectations that Congress arguably has the power to override if it so chooses. *Landgraf* stands for the proposition that people are entitled to rely on the law even when Congress has the power to make laws that dash expectations. This right to rely on settled law is essential to a system of law in which people can have some measure of certainty that they will have fair notice of the system of rules that will govern the consequences of their actions. It is the essence of the Rule of Law in which we take such pride.

 There is no merit to the government's assertion that *Landgraf* has no applicability to these cases because a section 212(c) application should be viewed as a prospective injunction that is properly governed by the law in effect at the time the injunction is issued. This argument misconstrues *Landgraf*'s discussion of the role of current law in injunction cases. *See Landgraf v. USI Film Products,* 511 U.S. 244, 273–74, 114 S.Ct. 1483, 1501–02, 128 L.Ed.2d 229 (1994). As the Court's citations make clear, the reference to "in futuro" injunctions refers to situations in which a court issues an injunction that will govern the ongoing conduct of the parties. In two of the cases cited in *Landgraf—Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921), and *American Steel Foundries v. Tri–City C.T. Council,* 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189 (1921)—the Court held that the Clayton Act's provisions on injunctions restraining labor activity should be applied to cases that were under judicial consideration. This result allowed the courts to issue orders regarding future activity that would comport with congressional guidance on the propriety of such injunctions. These principles have no application to the cases at bar where retroactive imposition of mandatory deportation provisions would radically alter the "legal consequences" of a conviction which is an "event[ ] completed before [the law's] enactment." *Landgraf,* 511 U.S. at 270, 114 S.Ct. at 1499 (emphasis added); *See also id.,* 511

U.S. at 293, 114 S.Ct. at 1508 (Scalia, J., concurring) (occurrence of primary conduct accorded new significance by the legislation is the "relevant event" for purposes of retroactivity analysis).

Acceptance of the government's claim that the AEDPA's restrictions on 212(c) relief are not retroactive because section 212(c) operates "prospectively" would undercut the Supreme Court's analysis of the statutory provisions at issue in the *Landgraf* case itself. That is, the damage remedies which were found impermissibly retroactive in *Landgraf* operated "prospectively" in the same sense, for compensatory and punitive damages for past misconduct would have been paid out in the future just as a successful section 212(c) application prevents the penalty of deportation for past misconduct from being imposed in the future. This cannot, however, obscure the reality that, just as the damage remedy proscribed in *Landgraf* would have been imposed based upon past conduct previously immune from such a remedy, section 212(c) relief is barred based upon past conduct that never previously carried such a bar.

In summary, "[i]n this area of law, involving as it may the equivalent of banishment or exile, we do well to eschew technicalities and fictions and to deal instead with realities." *Costello v. INS.* 376 U.S. 120, 131, 84 S.Ct. 580, 587, 11 L.Ed.2d 559 (1964). The reality here is that section 440(d) effects a drastic change in the law relating to the immigration consequences for a lawful permanent resident of the past commission and conviction of certain criminal convictions. By taking away the substantive right to apply for a waiver of deportation, the new law as interpreted by the Attorney General makes deportation automatic for convictions falling within the enumerated categories. As the court of appeals for the Second Circuit has held, with respect to the AEDPA's habeas amendments, if "the new statute would require a different outcome, application of the new statute would be retroactive." *Boria v. Keane,* 90 F.3d 36, 37 (2d Cir.1996). The AEDPA section 440(d) certainly imposes a different outcome, namely mandatory deportation instead of a real possibility of avoiding deportation by demonstrating favorable factors. This is just the

sort of retroactive effect that flies in the face of the anti-retroactivity principles expressed by the Supreme Court in *Landgraf*.

### (b) Traditional Principles of Statutory Interpretation

 Supreme Court has repeatedly held that any ambiguities in immigration statutes must be read to avoid deportation consequences. *See, e.g., INS v. Cardoza-Fonseca*, 480 U.S. 421, 449, 107 S.Ct. 1207, 1222, 94 L.Ed.2d 434 (1987) (discussing "the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien"). The Court has explained:

If [the language of the statute and the absence of legislative history] continued to leave the matter in some doubt, we would nonetheless be constrained by accepted principles of statutory construction in this area of the law to resolve that doubt in favor of the petitioner. As the Court has emphasized, deportation is a drastic measure and at times the equivalent of banishment or exile. It is the forfeiture for misconduct of residence in this country. Such a forfeiture is a penalty. To construe this statutory provision less generously to the alien might find support in logic. But since the stakes are considerable for the individual, we will not assume that Congress meant to trench on his freedom beyond that which is required by the narrowest of several possible meanings of the words used.

*Costello v. INS*. 376 U.S. 120, 128, 84 S.Ct. 580, 585, 11 L.Ed.2d 559 (1964) (citations and internal quotation marks omitted).

The Court has applied this principle to issues relating to the temporal reach of deportation legislation, finding that "[i]n the absence of a clear and definite expression, we are not at liberty to conclude that Congress intended that any alien, no matter how long a resident of this country, or however well disposed toward our government, must be deported, if at any time in the past, no matter when, or under what circumstances, or for what time, he was a member of the described organization." *Kessler v. Strecker*, 307 U.S. 22, 30, 59 S.Ct. 694, 698, 83 L.Ed. 1082 (1939) (interpreting statute providing for deportability based on membership in a subversive organization).

 If there is any ambiguity in a deportation statute, this rule of statutory construction requires an interpretation that favors the alien. This means that should a court have any lingering doubts regarding whether Congress plainly expressed its decision not to make the AEDPA section 440(d) applicable to pre-Act conduct or events, that doubt must be resolved in favor of petitioners, and other individuals like them who are now on the brink of deportation based on the government's misreading of the applicability of that statutory provision.

This rule of statutory construction serves a complementary function to the prospectivity rule explained in *Landgraf*. As discussed above, the *Landgraf* Court directed courts interpreting statutes to pay special attention to "unpopular groups or individuals." This rule of resolving ambiguities in favor of aliens is one specific example of general *Landgraf* principles.

### (c) No Deference to the Administrative Agency

 Contrary to the government's position, the decision of the Attorney General in *Matter of Soriano*, Int. Dec.3289, 1996 WL 426888 (beginning at screen page 37, AG Op. Feb. 21, 1997), is not entitled to deference under *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron*, the first question in interpreting a statute is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842, 104 S.Ct. at 2781. If the answer is yes, there is no need to proceed to consider the agency's interpretation. *Id.* In the cases at bar, the statute, read in context and against the backdrop of *Landgraf*, precludes the conclusion that Congress left the statute ambiguous. Congress knew that it had to include specific language to make provisions applicable retroactively; it did so to differing degrees with respect to other AEDPA immigration provisions; and it decided not to do so with respect to section 440(d). Such con-

gressional expression dictates the conclusion that section 440(d) may not be applied retroactively, whatever the opinion of the Attorney General. *See INS v. Cardoza–Fonseca,* 480 U.S. 421, 447–48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.") (citations omitted).

Even if there were some ambiguity in the statute, however, the general rule of deference to agency interpretations does not apply. Here, the Attorney General's opinion is not based on statutory construction but rather on her interpretation of judicial default rules enunciated by the Supreme Court. Accordingly, deference is wholly inappropriate. *See Akins v. Federal Election Commission,* 101 F.3d 731 (D.C.Cir.1996) (en banc) (rejecting *Chevron* deference for agency interpretation of Supreme Court construction of statute: "[a]gencies have no special qualifications or legitimacy in interpreting Court opinions"); *Vargas v. INS,* 938 F.2d 358, 363 (2d Cir.1991) (administrative agency decision not presented as statutory interpretation cannot command Chevron deference).

■■■■ any case, when an agency's interpretation conflicts with an established rule of statutory construction with substantive overtones, courts have given precedence to the rule of statutory construction. *See EEOC v. Arabian American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (the "[l]ong-standing principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States'" overrode any deference due under *Chevron* to the EEOC's interpretation of Title VII as applying extra-territorially); *Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989) (applying the canon that ambiguous statutes should be construed in favor of American Indians precluding deference to the agency's interpretation). The agency's interpretation must give way to the Supreme Court's long held rule of statutory construction that any ambiguities in deportation statutes should be

resolved in favor of the alien. *See Vargas,* 938 F.2d at 363 (*Chevron* must yield to principle of lenity in construing deportation statute). It must also recede to the *Landgraf* rules of construction disfavoring retroactive interpretations of statutes.

■■■ The general rule of deference to agency interpretations is premised on the assumption "that Congress, when it left an ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *See Smiley v. Citibank,* —— U.S. ——, ——, 116 S.Ct. 1730, 1733, 135 L.Ed.2d 25 (1996). Deference to an agency resolution of any ambiguity depends on the viability of the assumption that Congress left that ambiguity to the agency to resolve. In the context of retroactivity, *Landgraf* requires that Congress itself weigh the merits and demerits of retroactive application. The decision of to whom the statute applies and whether it should be read as delegating the question of retroactive application is not the sort of question that Congress can be expected to leave to an administrative agency. *See Teitelbaum v. Chater,* 949 F.Supp. 1206, 1214 n. 7 (E.D.Pa. 1996) (concluding that any ambiguity as to retroactive application of new disability rules "is more likely due to imperfect draftsmanship and not Congressional intent to allow the Commissioner to 'fill in the gaps'"); *cf. Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 93, 113 S.Ct. 2510, 2516, 125 L.Ed.2d 74 (1993) (referring to "quintessentially 'legislative' prerogative to make rules of law retroactive or prospective").

■■■ Where the issue is retroactivity, the fundamental principle is that Congress should not be seen as having acted against our deeply-rooted understanding of justice and human rights unless it has clearly indicated its intent to do so. It is not for the Attorney General to usurp Congress's obligation to think seriously about whether any national interest is served in the upsetting of past law including the past bargains that underlie the criminal justice system and international concerns.

The Attorney General's opinion is also undeserving of deference because it offers no interpretation at all of the statute or the purposes served by retroactivity. The opinion does not analyze the text of the statute. It does not offer any animating policy principles. It merely asserts improperly, as has been demonstrated, that retroactivity analysis does not apply.

Although it is not necessary to determine whether the Attorney General even had authority to issue her opinion overturning the decision of the Board of Immigration Appeals in *Matter of Soriano*, Int. Dec. 3289 (beginning at screen page 37, AG Op. Feb. 21, 1997) since decisions of the BIA under section 440(b) of the AEDPA of the BIA are "final," the court notes that pre–AEDPA law in this area supports the proposition that "the Attorney General cannot dictate the actions of the Board of Immigration Appeals, but must permit it to exercise its own independent discretion." 3 Charles Gordon, Stanley Mailmov, and Stephen Yale–Locks, Immigration Law and Procedure § 74.07[6] (1996). It is enough now to hold that *Soriano* was wrong on the merits. It constituted an arbitrary abuse of power by the Attorney General.

In view of this conclusion there is no need to consider whether any procedural error or late filing of a brief constituted laches by the government. *Cf. Anwar v. INS*, 107 F.3d 339 (5th Cir.1997) (where petitioner could not show he was a refugee, a failure to extend the deadline for his brief supporting a claim for discretionary grant of asylum created no prejudice).

### (d) *A Fortiori* Application to Those Whose Cases Were Being Processed by the INS

What has been demonstrated above supports a decision that retroactivity to the date of the crime or of the conviction is improper. *A fortiori*, that conclusion would protect petitioner Navas who not only was convicted long before the new statutes were adopted, but who already was being processed by the INS with the expectation that the then current section 212(c) ameliorative procedure would

apply. *See, Lindh v. Murphy*, —— U.S ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

## VI. Conclusion

Petitioners are in the legal custody of respondents for habeas corpus purposes. The court has personal jurisdiction over petitioners' custodians. Venue lies in the Eastern District of New York.

Section 440(d) of the AEDPA, which bars legal permanent residents who have been convicted of certain crimes from seeking a discretionary waiver of deportation, may not be applied retroactively to petitioners.

Without deciding them on the merits, petitioners' equal protection claims are dismissed as unnecessary for the disposition of these cases. Petitioner Mojica's laches claim is dismissed for the same reason.

The court has subject matter jurisdiction over these matters and has the power to issue writs of habeas corpus and declaratory judgments on behalf of the petitioners. Writs of habeas corpus are issued on behalf of petitioners. Petitioners' orders of deportation are vacated.

Respondents shall resume petitioners' deportation proceedings to adjudicate applications for waivers of deportation pursuant to section 212(c) of Immigration and Nationality Act without regard to section 440(d) of the AEDPA in accordance with this memorandum and judgment.

Enforcement of this judgment is stayed pending completion of appeals. Respondents have agreed not to deport petitioners until judicial review of deportation proceedings against petitioners is complete.

So Ordered.